ALASKA COMMUNITY COLLEGES' FEDERATION OF TEACHERS, LOCAL NO. 2404, Appellant,

v.

UNIVERSITY OF ALASKA, Jay Barton as President; and Edward Rasmuson, Jeffrey Cook, Don Abel, Jr., Herbert Lang, Mildred Banfield, Hugh Fate, Jr., Margaret Hall, Sam Kito, Jr., Thomas Miklautsch, Sharilyn Mumaw and John Shively, Members of the Board of Regents, as Agents; and State of Alaska, Appellees.

No. 6676.

Supreme Court of Alaska.

Feb. 3, 1984.

William K. Jermain, Jermain, Dunnagan & Owens, Anchorage, for appellant.

Terrance A. Turner, Owens & Turner, Anchorage, for appellees.

Before BURKE, C.J., RABINOWITZ, MATTHEWS, and COMPTON, JJ., and DIMOND, Senior Justice.[*]

OPINION

RABINOWITZ, Justice.

This appeal concerns the manner in which the Board of Regents of the University of Alaska reached its decision to merge two separate colleges to form the University of Alaska, Juneau (UAJ). The plaintiff below is the Alaska Community Colleges' Federation of Teachers, Local No. 2404 (ACCFT), the union which represented the faculty members of the former Juneau-Douglas Community College (JDCC).[1] The ACCFT asserts that the merger of the JDCC with the Southeastern Senior College (SSC) was approved by the Board of Regents in contravention of Alaska's public meetings statute, AS 44.62.310, and that the merger should be held void.

The Board of Regents originally approved the merger of the JDCC and the SSC on November 6, 1979. The agenda for the November 6, 1979 meeting made no explicit mention of the potential merger of the JDCC and the SSC. The agenda for the meeting did state, however, that the Board would go into executive session, closed to the public, to discuss "collective bargaining and UAJ reorganization." Following the noticed executive session on November 6, the board reconvened and without further discussion adopted a resolution to consolidate the JDCC and SSC into the UAJ.

The ACCFT responded to this decision on November 26, 1979, by filing suit for declaratory and injunctive relief in the superior court on the ground that the Board's procedure violated the public meetings law. The ACCFT alleged that the Board was not permitted under AS 44.62.310 to consider the merger question in a closed executive session, and that the Board was prohibited under the same statute from implementing the merger without receiving further public input.[2]

During the course of litigation, on May 19, 1981, the superior court granted the University 90 days in which to correct whatever infirmities may have existed in the Board's November 6, 1979 meeting. The superior court suggested the Board hold a properly-noticed meeting in Juneau to take public testimony on the merger and reconsider its previous decision. The University acted upon this suggestion, and convened a special meeting of the Board on July 30, 1981. The Board reviewed the background of the merger and heard public testimony. Following a public discussion on the merits of the merger, the Board affirmed its earlier decision.

Thereafter, the superior court granted summary judgment in favor of the University on the ACCFT's public meeting claims. The superior court held that the special meeting of the Board of Regents on July 30, 1981, validated the merger originally approved at the November 6, 1979 meeting. The superior court further concluded that the July 30, 1981, meeting was in compliance with the Alaska Open Meetings Act (OMA). As a result of this subsequent validation, the court found it unnecessary to consider the legal questions arising from the November 1979 meeting. The superior court additionally held that the ACCFT's failure to press its suit after filing it meant that its claims were barred by the doctrine of laches. The ACCFT appeals from the above rulings.

■ If a public body acts in violation of the OMA, its actions are void. Remedial efforts, such as those the Board of Regents made in this case, present reviewing courts with complex problems. Because the superior court did not analyze these problems in a manner we think necessary to serve the

[*] Dimond, Senior Justice, sitting by assignment made pursuant to Article IV, section 11 of the Constitution of Alaska.

1. Pursuant to AS 23.40.070, the union was certified as the collective bargaining representative of all the statewide community college faculty at the University.

2. There is no dispute in this case that the Alaska Open Meetings Act applied to the Board of Regents. See AS 14.40.160(a).

OMA's purposes, we conclude the case must be remanded. On remand, the entire case—including the question of whether or not the 1979 meeting violated the Act—will again be before the superior court.

## I. *The 1979 Meeting.*

The superior court should have begun its analysis by deciding whether the Board's 1979 meeting violated the OMA. The effectiveness of any later meeting designed to cure an OMA violation obviously depends on the seriousness of this violation. The more egregious the violation, the more closely a reviewing court should view efforts to remedy it. Because any assessment of what happened at the Board's 1981 meeting must take into consideration what may have been an improper 1979 meeting, the superior court should carry its factual findings about the 1979 meeting forward to a legal conclusion.

■ Further, the ACCFT's claims arising out of the 1979 meeting are not barred even if the 1981 meeting cured previous violations. The issues surrounding the first meeting are of sufficient public importance that the ACCFT may prosecute its declaratory action, even assuming technical mootness. *See Witt v. Watkins*, 579 P.2d 1065, 1071 n. 19 (Alaska 1978) ("where a resolution of a particular question is of significant public interest, we may, in our own discretion, resolve it despite the fact that the parties have settled their dispute"). Here we agree with the court in *Crifasi v. Governing Body of the Borough of Oakland*, 156 N.J.Super. 182, 383 A.2d 736, 738 (1978), that "many public bodies

... are in need of guidance as to the proper construction of the Sunshine Law." [3]

In addition, we conclude that the ACCFT's claim is of a type which would consistently evade review if we were to hold that validation may shield the earlier meeting from judicial inquiry. *See Anchorage Education Association v. Anchorage School District*, 648 P.2d 993, 994 (Alaska 1982); *State v. Thompson*, 612 P.2d 1015, 1016 (Alaska 1980); *State v. Wassillie*, 606 P.2d 1279, 1280 (Alaska 1980); *Doe v. State*, 487 P.2d 47, 53 (Alaska 1971) ("where the matter is one of grave public concern and is recurrent but is capable of evading review, we have undertaken review even though the question may be technically moot"). The mootness bar is especially inappropriate in OMA cases. The public disclosure of the nature and circumstances of an OMA violation is an important component of the remedy available under the statute.[4] Therefore, we remand to the superior court for further proceedings to determine the ACCFT's declaratory action challenge to the propriety of the November 6, 1979 meeting.[5]

## II. *Ratification of a Decision Rendered in Noncompliance with the Public Meetings Act.*

If, on remand, the superior court concludes that the November 1979 meeting of the Board of Regents did not conform with the OMA, it will become necessary for that court to rule upon the difficult question of when voluntary ratification of a decision made in nonconformity with the requirements of AS 44.62.310 may be effective.

---

3. The court in *Crifasi* passed on the merits of a sunshine law claim despite the fact that the defendant public body had held an effective ratification meeting prior to appeal.

4. AS 44.62.312(5) provides that "the people's right to remain informed shall be protected." The broad policies articulated in section 312 mandate that the functioning of government should be open. We think this applies to malfunctioning as well. The philosophy behind the OMA is that publicity will have a salutary effect upon the behavior of government officials, making them more responsive to public concerns. *See* Note, Open Meeting Statutes: The Press

Fights for the "Right to Know", 75 Harv.L.Rev. 1199, 1200–1201 (1962).

5. In the event the superior court finds the July 1981 ratification meeting was ineffective, injunctive relief may also be ordered by the court. We note that a remedy which is sometimes made available in the sunshine laws of other states, but which is not created in the Alaska statute, is an injunction against a transgressing public body forbidding future violations. *See* Note, *supra* note 4, 75 Harv.L.Rev. at 1214–1215. This brings to bear the coercive judicial power in subsequent cases, in addition to the remedies otherwise provided by the statute.

The open meetings statute does not speak directly to the issue of ratification. The parties' arguments proceed from the terse remedial provision of the sunshine law contained in AS 44.62.310(f): "Action taken contrary to this section is void."

In the sole case where we have considered the issue, we held that a void decision under section 310(f) must be sent back to the decision-maker for new consideration. *University of Alaska v. Geistauts,* 666 P.2d 424 (Alaska 1983). *Geistauts* suggests that the ultimate remedy in an OMA case is a remand to the transgressing governmental body, which may either ratify or reject its original decision, subject to the statutorily required public scrutiny.

The ACCFT points out, however, that ratification should be effective only after a true reconsideration. Although presenting no factual support for the charge, the union contends that the validation meeting by the Board of Regents merely "rubber-stamped" the original merger decision. Implicit in the union's position is the idea that a *decision-in-place* carries inertia, and that the University is unlikely to reverse an action such as the UAJ merger two years after the fact. The direction the union's argument appears to take is this: before the UAJ merger decision may be reconsidered, the merger must be voided and the JDCC and SSC restored to independent operation. Only then will the Board of Regents be writing on a clean slate when it reappraises the merger action.

We agree that approximation of the status quo at the time of the original decision is desirable. A court fashioning a remedy under section 310(f) should attempt to recreate the circumstances surrounding the defective meeting to the extent practicable. Exact duplication of the context of the first meeting is not possible. Even if the decision-making entity can return to its pre-decisional state of mind, it must nevertheless respond to information and developments arising since the time of the first meeting.[6] It is unavoidable and proper that the ratification body act upon all knowledge available to it.[7]

The gap between the "ideal" remedy under the OMA (a return to the exact setting of the original decision) and a practicable remedy widens with the passage of time. Eighteen months passed between the first decision to consolidate the Juneau colleges and the ratification meeting. If the end result of this litigation were an order to reconvene the Board for a third meeting, the time displacement would now be four or five years from the original action. While we do not dismiss this remedy as improper, we believe it illustrates an important point. There is a limit upon the extent to which the desire to recreate the circumstances of the first meeting answers all of the remedial questions posed by AS 44.62.310(f). Clearly other factors must also guide the courts in fashioning a remedy.

Concededly section 310(f) does not set forth a detailed scheme for the enforcement of the open meeting laws.[8] As the University observes, "[t]he statute is silent as to how 'void' action is to be remedied or cured." Consequences of voidness must

---

**6.** In *Geistauts,* we ordered the tenure committee which had denied Geistauts tenure to reconvene and to consider Geistauts' academic accomplishments since the time of his denial. *Id.* at 430–31.

**7.** If the 1981 ratification was not effective the Board will at some point have the opportunity to reconsider its merger decision. In that event, the Board should focus its discussion on the merits of a consolidated UAJ as perceived at the time of this new validation meeting rather than reviewing the question of whether the merger was warranted based upon the information available at the original meeting. This in fact is the pattern which emerges from the record of the 1981 ratification meeting in Juneau. It is in the public interest to use hindsight in such an instance.

**8.** One commentator has cited AS 44.62.310(f) as an example of sunshine law invalidation provisions which "are generally short, mechanistic, and inadequate to deal with the difficulties involved." Comment, Invalidation as a Remedy for Open Meeting Law Violations, 55 Ore.L.Rev. 519, 524 & n. 25 (1976). Our decision today in no way forecloses the Alaska legislature from fashioning a statutory solution to this problem.

therefore be determined with reference to the purposes underlying the OMA.

AS 44.62.312, entitled "State policy regarding meetings," provides an enunciation of the board concerns embodied in AS 44.-62.310.[9] Section 312 makes clear that the OMA exists primarily to advance the interests of "the people of this state." When the sunshine law is breached it is "the people's right to remain informed" which sustains injury. There is no inherent damage stemming from the substantive action which is taken; it is the manner of action which offends. Of course, AS 44.62.310, by ensuring that issues are decided publicly, does attempt to insure that better substantive decisions are made through public scrutiny and adequate information.

The commentators who have reported upon the sunshine laws in other jurisdictions present a picture of the intent behind these statutes consistent with our reading of AS 44.62.312. Open decision-making is regarded as an essential aspect of the democratic process. It is believed that public exposure deters official misconduct, makes government more responsive to its constituency, allows for greater public provision of information to the decision-maker, creates greater public acceptance of government action, and promotes accurate reporting of governmental processes. Note, *Open Meeting Statutes: The Press Fights for the "Right to Know,"* 75 Harv.L.Rev. 1199, 1201–1202 (1962). *See also* Comment, *Invalidation as a Remedy for Open Meeting Law Violations,* 55 Ore.L.Rev. 519, 519–20 n. 2 (1976); Note, *Freedom of Information,* 49 Tex.L.Rev. 764, 764 & n. 2 (1970). Note that none of the above rationales focus upon the substance of the decision made.

To extend this observation further, open meeting statutes were not primarily intended as vehicles for individuals displeased with governmental action to obtain reversals of substantive decisions. What the statutes envision instead is that non-conforming procedures be righted as near to the point of derailment as possible, and that the governmental process be allowed to resume from there.[10]

Because the OMA protects a public right, the courts must carefully consider public interest concerns in applying section 310(f). Mechanistic vacation of decisions made in nonconformity with the sunshine law may do more disservice to the public good than the violation itself. In a complex case such as the one at hand, many equitable variables must be considered in passing upon the effectiveness of a voluntary ratification.

First, it must be asked whether the validation meeting functioned as a true de novo consideration of the defective action. If the circumstances of ratification suggest that the reconsideration was not substantial, it is open to the trial court to reject the validation attempt, and formulate a remedy which will ensure a more adequate reappraisal. In the extreme case, where no substantial reconsideration appears possible and only the outright reversal of the implemented decision ensures de novo ex-

---

9. AS 44.62.312 provides:

*State policy regarding meetings.* (a) It is the policy of the state that

    (1) the governmental units mentioned in AS 44.62.310(a) exist to aid in the conduct of the people's business;

    (2) it is the intent of the law that actions of those units be taken openly and that their deliberations be conducted openly;

    (3) the people of this state do not yield their sovereignty to the agencies which serve them;

    (4) the people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know;

    (5) the people's right to remain informed shall be protected so that they may retain control over the instruments they have created.

10. It is possible to view the remedial problems in this case from the perspective of the private plaintiff. We think that the end result remains the same. Ideally the plaintiff is entitled to be placed in the position he would have been in had the violation never occurred. That position is not one where the adverse decision is never made. Instead it is one where the decision, adverse or not, is taken in conformity with the sunshine laws. A successful plaintiff in an OMA suit wins reconsideration, not necessarily a different final outcome.

amination, the court may order the decision undone.

We offer the following as a guide to the superior court if it finds it must determine whether the UAJ merger should be voided. First, reversal of the consolidation will necessarily involve a ·waste of public resources. It should not be ordered if open and substantial reconsideration has been achieved, or may be achieved at a third meeting. We do not think costly backtracking directly serves the OMA's public interest goals where less expensive measures are adequate and available.

■ However, this case may well present a circumstance where the Board of Regents could not honestly reconsider UAJ consolidation because of the time and resources the University system had already invested in the merger. If the superior court arrives at such a finding, we conclude that the University must show that the prejudice which would be incurred by the public (if the merger were voided) outweighs the remedial priorities of the OMA. If the superior court determines that the damage to the public good outweighs the benefits derived from the dissolution of the UAJ, it may conclude that no further coercive remedy is appropriate.

In certain circumstances a decision taken in violation of the OMA, and never adequately cured, will be allowed to stand. A significant part of the OMA remedy requires that the nature and circumstances of violations come to light. Because we have previously held that voluntary ratification of defective actions under the OMA does not necessarily render the violations moot,

declaratory relief will frequently be available to OMA plaintiffs.

■ In addition, the remedial balance created today should be recognized as related to the doctrine of laches. That doctrine focuses upon the fault of the plaintiff in failing to prosecute his suit seasonably,[11] and upon the prejudice suffered by the defendant if the court were to award a belated remedy. *Moore v. State*, 553 P.2d 8, 15 (Alaska 1976). Thus, laches responds to private equities, and is poorly designed for OMA cases, where the plaintiff asserts a public right. We think that the scope of available remedies under Alaska's sunshine law should not be determined with reference to the relative fault of the parties.[12] Rather, we extract from the laches doctrine two "equitable considerations" to be used as a guideline for evaluating the propriety of injunctive relief. The trial court must look to the substantiality of the "interests to be vindicated" under the statute as balanced against the "resulting prejudice" to the public good. *See Moore v. State*, 553 P.2d at 16. Other factors ·relating to the behavior of the litigants should be given little emphasis.[13]

■ We thus remand this case for a new trial. On remand, the superior court should determine whether or not the November 6, 1979, merger action violated OMA requirements. The burden here is on the ACCFT to show by a preponderance of the evidence that a transgression occurred. If no illegality is found, judgment should be entered in favor of the University. However, if a violation is established, the superior court must then examine the July 6, 1981, meeting to determine whether the

11. We have described the relevant concern as whether the plaintiff has been guilty of "inexcusable delay" so that maintenance of the suit is "unconscionable." *Concerned Citizens of South Kenai Peninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 457 (Alaska 1974). *See also Moore v. State*, 553 P.2d 8, 15 (Alaska 1976).

12. Thus we reject the superior court's alternative holding that the doctrine of laches bars any grant of relief to ACCFT.

13. In *Moore* we said that:

The point in time at which plaintiffs must exercise their remedies in court or lose their right to assert their cause of action depends on the facts and equitable considerations of each case, including the knowledge of the plaintiffs, the conduct of the defendants, the interests to be vindicated, and the resulting prejudice.

553 P.2d at 16. *See also Concerned Citizens of South Kenai Peninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 457 (Alaska 1974).

Board's voluntary ratification was effective. In this respect the court must determine whether a substantial reconsideration was made at the validation meeting, or whether the fait accompli of the UAJ merger had prevented actual reappraisal of the action. It is for the University to show that a substantial reappraisal in fact occurred. If the University fails to meet this requirement, the court must then decide whether invalidation of the merger is a proper remedy. It may be so only if the court determines that such a dissolution is a necessary prerequisite to actual reconsideration of the merger question by the Board of Regents. Assuming the court reaches such a conclusion it must still determine that the overall public interest will be served by dismantling the UAJ. This determination should be made by weighing the remedial benefits to be gained in light of the goals of the OMA against the prejudice likely to accrue to the public if the UAJ is dissolved. The ultimate decision is left to the discretion of the superior court.

The judgment of the superior court is REVERSED and the cause REMANDED for further proceedings consistent with this order.

MOORE, J., not participating.