2011 WY 13

Don GRONBERG, Sue Gronberg, Jim Farmer, Wes Fox, Renelda Fox, Christy Fox, Jenny Fox, Dennis Cichelli, Sue Cichelli, Deborah Fox, Don Landis, Beverly Landis, Scott Austin, Holly Austin, Robin Moyer, Peter Moyer, Emily Moyer, Doug Hanson, Anna Marie Hanson, Barbara Sellas, Deborah D. Ward, Paul Perry, Pam Romsa, Lou Breitenbach, Ken Jern and Sherrie Jern, Appellants (Plaintiffs),

v.

TETON COUNTY HOUSING AUTHORITY and Erving W. Mantey and Caryl S. Mantey, Appellees (Defendants).

No. S-10-0018.

Supreme Court of Wyoming.

Feb. 1, 2011.

Representing Appellants: Peter F. Moyer, Jackson, Wyoming.

Representing Appellee Teton County Housing Authority: James L. Radda, Deputy County Attorney, Jackson, Wyoming.

Representing Appellees Mantey: Andrea L. Richard of Richard Law Firm, Jackson, Wyoming.

Before KITE, C.J., and HILL, VOIGT *, and BURKE, JJ., and KAUTZ, D.J.

KAUTZ, District Judge.

[¶ 1] Gronberg, et al., (Appellants) sued the Teton County Housing Authority (TCHA), claiming that TCHA violated Wyoming's Public Meetings Act, improperly purchased land for investment purposes and incurred debt in violation of the Wyoming Constitution and Wyoming Statutes. The district court dismissed some claims under W.R.C.P. 12(b)(6) and granted summary judgment in favor of TCHA on other claims. Appellants appeal those rulings. We affirm the district court on the Public Meetings Act and Wyoming Constitutional issues, but reverse on the Rule 12(b)(6) dismissals of claims for improperly purchasing the land and financing the purchase.

* Chief Justice at time of oral argument.

## ISSUES

[¶ 2] Appellants present the following issues on appeal:

I. Could the Appellee Teton County Housing Authority (TCHA) ratify a real estate sale over 9 months after an illegal meeting occurred approving the transaction and over 4 months after the actual closing, where TCHA acknowledges that the only vote at the meeting was taken during a secret executive session resulting in a "null and void" approval?

II. After the real estate closing occurred, is TCHA, as a public Wyoming agency, entitled to keep secret an 8 page transcript and tape recording of the illegal meeting, where it improperly approved the expenditure of $2.1 Million in public funds for the real estate purchase?

III. Is TCHA entitled to pursue a "land banking" real estate investment program, not housing projects, where the applicable specific purpose excise tax (SPET) funding was approved by the voters for "affordable housing projects," and Wyoming Statutes limit the use of SPET funds to the purposes approved by the voters, and where Wyoming Statutes strictly limit investments by public agencies?

IV. Is TCHA, as a public Wyoming agency, entitled to mortgage its properties and to pledge future tax receipts?

V. Can the Appellants present these issues in a declaratory judgment action?

[¶ 3] TCHA chose not to submit its own list of issues.

## FACTUAL BACKGROUND

[¶ 4] Appellants are landowners and/or residents of Teton County, Wyoming. TCHA is a housing authority established by the Teton County Commissioners pursuant to Wyo. Stat. Ann. §§ 15–10–101 through 117 (LexisNexis 2009), which gives counties and municipalities in Wyoming the authority to create "housing projects." Housing projects basically involve (1) planning, (2) cleaning up or removing substandard buildings, and (3) providing or assisting in providing suitable houses to persons of low income. Wyo. Stat. Ann. § 15–10–101(a)(ii). A county or munici-pality may exercise its housing project powers directly, or it may establish a "housing authority" to act on behalf of the county or municipality. Wyo. Stat. Ann. § 15–10–115(a).

[¶ 5] Teton County chose to establish TCHA to act on its behalf in performing its housing project powers. In 2006, the voters in Teton County approved a sales tax, known as a Special Purpose Excise Tax, or SPET, to fund TCHA's "affordable housing project." Such a tax is authorized by Wyo. Stat. Ann. § 39–15–204(a)(iii) (LexisNexis 2009) which requires tax proceeds to be used "for specific purposes authorized by the qualified electors." The ballot for the tax stated that voters were deciding whether to fund

$5,000,000.00 for the Teton County Housing Authority's Affordable Housing Program (the "project"), which shall include the acquisition, planning, improvement and financing of properties as allowed by law and to be utilized for affordable housing, or the pledge and use to pay debt service and/or lease payment for such purpose . . . .

[¶ 6] TCHA purchased real estate including the Mantey property. TCHA members recognized that the Mantey property might not be appropriate for an "affordable housing" project. Even so, the TCHA board thought the Mantey purchase would constitute good "land banking" and would be used either directly or indirectly for affordable housing. TCHA borrowed $2 million of the purchase price for the Mantey property, planning to use future SPET receipts to pay that debt.

[¶ 7] Before purchasing the Mantey property, the TCHA board discussed the purchase in an executive session on March 1, 2007. It voted to purchase the property in that executive session, and the transaction closed on June 9, 2007. After learning that the vote to purchase the Mantey property should not have occurred in a closed executive session, TCHA voted to ratify the purchase on September 20, 2007. When questions developed about public notice for the September 20, 2007 meeting, TCHA voted to ratify the purchase again on November 15, 2007.

[¶ 8] Appellants sued TCHA and the Manteys, seeking declaratory relief. The district court dismissed some of Appellants' claims under W.R.C.P. 12(b)(6), finding that Appellants could not present any facts under those claims that would entitle them to relief. The district court granted summary judgment in favor of Appellees on the balance of the claims.

[¶ 9] Further facts are included below with the analysis for each issue.

## STANDARD OF REVIEW

[¶ 10] The district court dismissed some claims under W.R.C.P. 12(b)(6). These dismissals relate to issues II and IV, listed above. When reviewing a W.R.C.P. 12(b)(6) dismissal, we focus on the allegations contained in the complaint and liberally construe those allegations in the light most favorable to the plaintiff. *Cox v. City of Cheyenne*, 2003 WY 146, ¶ 7, 79 P.3d 500, 505–506 (Wyo. 2003) (citation omitted). We will affirm an order of dismissal only when it is certain from the face of the complaint that the plaintiff cannot assert any facts which would entitle him to relief. *Id.* Dismissal under W.R.C.P. 12(b)(6) is warranted if, having assumed the allegations of the complaint are true and viewing the facts in the light most advantageous to the plaintiffs, the facts dictate judgment for the defendant as a matter of law. *Cantrell v. Sweetwater County School District No. 2*, 2006 WY 57, ¶ 4, 133 P.3d 983, 984 (Wyo.2006). Dismissal is a drastic remedy and is sparingly granted; nevertheless, we will sustain a W.R.C.P. 12(b)(6) dismissal when it is certain from the facts of the complaint that the plaintiff cannot assert any set of facts that would entitled that plaintiff to relief. *Robinson v. Pacificorp*, 10 P.3d 1133, 1135–36 (Wyo.2000).

[¶ 11] The district court entered summary judgment in favor of Appellees on claims that TCHA's land purchase was void because it violated Wyoming's Public Meetings Act, and that TCHA had no authority to purchase land as an investment. We review an order granting summary judgment *de novo*. *Wyoming Med. Center, Inc. v. Wyoming Ins. Guar. Ass'n*, 2010 WY 21, ¶ 11, 225 P.3d 1061, 1064 (Wyo.2010).

[W]e have exactly the same duty as the district judge; and if there is a complete record before us, we have exactly the same material as did [the district judge]. We must follow the same standards. The propriety of granting a motion for summary judgment depends upon the correctness of a court's dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. This court looks at the record from the viewpoint most favorable to the party opposing the motion, giving to him all favorable inferences to be drawn from the facts contained in affidavits, depositions and other proper material appearing in the record.

*Id.* (citation omitted). Summary judgment is appropriate in a declaratory judgment action so long as there are no genuine issues of material fact. *Snake River Brewing Co., Inc. v. Town of Jackson*, 2002 WY 11, ¶ 4, 39 P.3d 397, 402 (Wyo.2002).

## DISCUSSION

### I. Can a public agency ratify or cure a violation of the Wyoming Public Meetings Act?

[¶ 12] We construe statutes according to the following standards:

The paramount consideration is to determine the legislature's intent, which must be ascertained initially and primarily from the words used in the statute. We look first to the plain and ordinary meaning of the words to determine if the statute is ambiguous. A statute is clear and unambiguous if its wording is such that reasonable persons are able to agree on its meaning with consistency and predictability. Conversely, a statute is ambiguous if it is found to be vague or uncertain and subject to varying interpretations. If we determine that a statute is clear and unambiguous, we give effect to the plain language of the statute.

*Morris v. CMS Oil and Gas Co.*, 2010 WY 37, ¶ 26, 227 P.3d 325, 333 (Wyo.2010) (citation omitted).

[¶ 13] The Wyoming Public Meetings Act requires most governmental actions to be taken in public meetings. Wyo. Stat. Ann. § 16–4–401 (LexisNexis 2009) specifies that "[t]he agencies of Wyoming exist to conduct public business. Certain deliberations and actions shall be taken openly as provided in this act." Wyo. Stat. Ann. § 16–4–403(a) (LexisNexis 2009) provides:

> All meetings of the governing body of an agency are public meetings, open to the public at all times, except as otherwise provided. No action of a governing body of an agency shall be taken except during a public meeting.... Action taken at a meeting not in conformity with [the public meetings] act is null and void and not merely voidable.

Wyo. Stat. Ann. § 16–4–402(a)(i) (LexisNexis 2009) defines "action" as follows:

> (i) "Action" means the transaction of official business of an agency including a collective decision of a governing body, a collective commitment or promise by a governing body to make a positive or negative decision, or an actual vote by a governing body upon a motion, proposal, resolution, regulation, rule, order or ordinance.

[¶ 14] TCHA agrees that it violated Wyo. Stat. Ann. § 16–4–403(a) when it voted to buy the Mantey property at an "executive session" which was closed to the public, on March 1, 2007.[1] It later took steps to remedy that error by properly publishing notice and conducting a public meeting. The issue here is whether a decision made in violation of the Public Meetings Act can ever be remedied, and if so, how. We have not previously addressed this issue directly.

[¶ 15] Our previous cases applying the Act have only arisen when an agency met in private, in violation of the Act, yet did not take action on the deliberated matter until a public meeting occurred. Under those circumstances, we have found the Act was not violated, and the action taken is not null and void, notwithstanding the private delibera-

tions. *See Cheyenne Newspapers, Inc. v. Building Code Board of Appeals of the City of Cheyenne,* 2010 WY 2, 222 P.3d 158 (Wyo. 2010); *Mayland v. Flitner,* 2001 WY 69, 28 P.3d 838 (Wyo.2001).

[¶ 16] The Public Meetings Act does not address whether an agency which improperly attempts an action in a closed meeting may later correct that error by properly taking action in a public meeting. Appellants contend that because the initial decision to purchase the Mantey property was made in violation of the Public Meetings Act, the transaction is null and void. They assert that TCHA must first undo the transaction, and then start over, if it wants to own the Mantey property.

[¶ 17] The district court resolved this issue via summary judgment, determining that TCHA had effectively cured any violation of the Public Meetings Act by later re-voting on the Mantey purchase in a properly-noticed public meeting, first on September 20, 2007, and again on November 15, 2007. The facts before the district court for the purpose of summary judgment on this matter were undisputed. They showed that TCHA in fact independently reconsidered the transaction twice, and both times voted to ratify the purchase of the Mantey property.

[¶ 18] When TCHA reconsidered the Mantey property purchase on September 20, 2007, its attorney opened the issue by stating:

> So tonight I ask you to consider whether you want to ratify the agreement to purchase the Mantey property or not to ratify it. And the law requires that you do so with an open mind and you have to keep in mind that not ratifying this agreement is just as much an option as ratifying the agreement. So I ask you to, you know, go back in time and try to recollect back in March 1, on March 1, what the reasons were at that time for going forward with the agreement and for making the offer, and I do recall that at the meetings we

---

1. Wyo. Stat. Ann. § 16–4–405(a)(vii) permits the governing body of an agency to hold a closed executive session "[t]o consider the selection of a site or the purchase of real estate when the publicity regarding the consideration would cause a likelihood of an increase in price." Appellees contend that discussion about the transaction was proper in executive session, but that their vote to make an offer on the property was not.

had, excuse me, after the Jackson State Bank decided they were not going to finance the property I think there was even some discussion at some of those special meetings about whether this, whether this was something the Board still wanted to go through, and you had discussion at that time about the merits of going forward with the agreement, so I'm asking the Board to, to with a very open mind, decide tonight whether to ratify this agreement weighing all the pros and cons that you considered when you discussed alternative financing and any pros and cons that you might be, that you might consider tonight. And then when you do, at some point I would ask the chair to ask for public comment. Are there any questions at this point?

[¶ 19] TCHA's counsel then engaged in a conversation with one of the board members, in which counsel stated that one of the board's options was to rescind the agreement to purchase the Mantey property. The Chairman then asked for public comment. There was none. The board then voted to ratify the purchase.

[¶ 20] When a question arose about public notice for the September 20, 2007, meeting, TCHA held a second hearing on November 15, 2007. TCHA's counsel again made a statement to the board asking it to approach the issue with an open mind, cautioning that "rescission is just as much an option as ratification so I would ask you to once again consider whether you do in fact want to ratify or not ratify your purchase of the Mantey property, which occurred in July [2007]." After discussion among the board members, the board again voted to "ratify" the purchase.

[¶ 21] These facts were undisputed. TCHA independently and substantially reconsidered the Mantey purchase, and properly voted to ratify that purchase in a public meeting. Although we have not previously considered whether "void" action under the Public Meetings Act can later be ratified or cured, as was done here, other states with similar statutes have. We find discussions from Alaska and Tennessee particularly helpful.

[¶ 22] In *Alaska Community Colleges' Federation of Teachers, Local No. 2404 v. University of Alaska*, 677 P.2d 886, 891–892 (Alaska 1984), the university board of regents voted in executive session to merge separate colleges into a state university system. The applicable section of Alaska's public meeting law then provided "[a]ction taken contrary to this section is void." *Id.* at 890. The Court recognized, however, that the Alaska Act was silent as to how a void action could be remedied. Examining the Act's purpose and the consequences of curing a void action, the court stated:

[Alaska's Open Meeting Act] exists primarily to advance the interests of "the people of this state." When the sunshine law is breached it is "the people's right to remain informed" which sustains injury. There is no inherent damage stemming from the substantive action which is taken; it is the manner of action which offends. Of course, [the Open Meeting Act], by ensuring that issues are decided publicly, does attempt to insure that better substantive decisions are made through public scrutiny and adequate information.

The commentators who have reported upon the sunshine laws in other jurisdictions present a picture of the intent behind these statutes consistent with our reading of [the Alaska Open Meeting Act]. Open decision-making is regarded as an essential aspect of the democratic process. It is believed that public exposure deters official misconduct, makes government more responsive to its constituency, allows for greater public provision of information to the decision-maker, creates greater public acceptance of government action, and promotes accurate reporting of governmental processes.... Note that none of the above rationales focus upon the substance of the decision made.

*Id.* at 891.

[¶ 23] Using this rationale, the Alaska Supreme Court determined that the policy behind open meeting laws does not prohibit ratification of a "void" action. The void act itself is not offensive to the law, but the closed process is offensive. Public ratification cures that problem.

[¶ 24] In *Neese v. Paris Special School District*, 813 S.W.2d 432 (Tenn.Ct.App.1990), the Tennessee Court of Appeals also considered whether a void decision could be ratified. It stated:

[Tennessee's open meeting act] provides that "[a]ny action taken at a meeting in violation of this part shall be void and of no effect...." We do not believe that the legislative intent of this statute was forever to bar a governing body from properly ratifying its decision made in a prior violative manner. However, neither was it the legislative intent to allow such a body to ratify a decision in a subsequent meeting by a perfunctory crystallization of its earlier action. We hold that the purpose of the act is satisfied if the ultimate decision is made in accordance with the Public Meetings Act, and if it is a new and substantial reconsideration of the issues involved, in which the public is afforded ample opportunity to know the facts and to be heard with reference to the matters at issue. See *Alaska Comm. Coll. Fed. of Teachers v. University of Alaska*, 677 P.2d 886, 891 (Alaska 1984).

*Id.* at 436.

[¶ 25] The purpose of Wyoming's Public Meetings Act is to require open decision making, not to permanently condemn a decision or vote in violation of the Act. The focus of the Act is on the process of governmental decision making, and not on the ultimate decisions. It follows that the Act would permit ratification of a prior "void" action, if the ratification is done in compliance with the Act. We hold that an agency may "cure" a "void" action made in violation of the Public Meetings Act by conducting a new and substantial reconsideration of the action in a manner which complies with the Act. Because the undisputed facts show that TCHA did conduct a new and substantial reconsideration of its decision to purchase the Mantey property, the district court properly granted summary judgment on this issue.

## II. Are Appellants entitled to a transcript and recording of the March 1, 2007, executive session?

[¶ 26] Appellants sought a copy of the record made of TCHA's March 1, 2007, executive session. After ruling that TCHA had properly ratified its March 1, 2007, vote to purchase the Mantey property, the district court ruled that the request was moot. A district court's decision on the question of mootness is an issue of law that we review *de novo*. *Northfork Citizens for Resp. Dev. v. Bd. of County Comm'rs of Park County*, 2010 WY 41, ¶ 16, 228 P.3d 838, 844 (Wyo. 2010). In *Northfork* we quoted Wyoming's law on mootness from *Bard Ranch Co. v. Frederick*, 950 P.2d 564, 566 (Wyo.1997):

Our general law on justiciability provides that courts should not consider issues which have become moot. We do not decide cases when a decision will have no effect or pertains only to matters that might arise in the future. A case is moot when the determination of an issue is sought which, if provided, will have no practical effect on the existing controversy.

*Northfork*, ¶ 18, 228 P.3d at 845.

[¶ 27] Production of a transcript or recording of the executive session of TCHA would not have an effect on the issue of whether TCHA properly ratified its decision later. However, a record of the executive session proceedings could have an impact on other issues that remain pending in this case. As we discuss later in this decision, factual issues remain as to whether TCHA purchased the Mantey property as an investment, or for direct use as part of an affordable housing project. Appellants' claim for discovery of the record of the executive session is not moot with respect to that factual issue.

[¶ 28] Although Appellants argued that they are entitled to the record of the March 1, 2007, TCHA executive session, they entirely ignored Wyo. Stat. Ann. § 16–4–405(b). That statute provides:

Except for those parts of minutes of an executive session reflecting a members' objection to the executive session as being in violation of this act, minutes and proceedings of executive sessions shall be confidential and produced only in response to a valid court order.

We hold that the district court improperly dismissed Appellants' claim demanding a record of the executive session. The district court may consider reviewing the record in camera before determining if the matters discussed were appropriately considered in executive session and whether the record is appropriately discoverable under Wyo. Stat. Ann. § 16–4–405(b).

### III. Can TCHA pursue a "land banking"[2] real estate investment program?

#### A. SPET Ballot Limits

[¶ 29] In their complaint against TCHA, Appellants asserted TCHA could not purchase the Mantey property as an investment or for the purpose of "land banking" for two reasons. First, they claimed that Wyo. Stat. Ann. § 39–15–204(a)(iii) required TCHA to use the SPET revenues only for the specific purposes authorized when the tax was approved. They claimed that TCHA's purchase of real estate not specifically designated to be used for affordable housing was outside the specific purposes authorized by voters.

[¶ 30] The district court dismissed this claim under W.R.C.P. 12(b)(6). The court ruled:

Viewing the evidence in the light most favorable to the Plaintiffs, the Court finds that Defendant TCHA was acting within the limitations of the SPET ballot and under the authority of Wyoming law. Thus, the Court grants the motion.

To reach that conclusion, the district court said:

Evidence provided by the Plaintiffs shows that the Manteys sold the Cheney Lane Parcel to TCHA with the intent that the property be used for affordable housing. Information submitted by TCHA to the Teton County Commissioners, also provided by the Plaintiffs, stated that the Cheney Lane property acquisition was for the purpose of affordable housing land banking. It is apparent from the statement of both sellers and buyers that the Cheney Lane land acquisition was to be utilized for affordable housing, either directly or indirectly if a housing project were not approved on the land.[3]

[¶ 31] The district court found, on the basis of Appellants' complaint, that TCHA purchased the Mantey property "to be utilized for affordable housing, **either directly or indirectly**." (Emphasis added). The district court also found that TCHA purchased the property "for the purpose of affordable housing land banking." Based on these findings the district court ruled, as a matter of law, the Mantey purchase was within the authority granted by voters on the SPET Ballot.

[¶ 32] Wyo. Stat. Ann. § 39–15–204(a)(iii) requires SPET proceeds to be used "for specific purposes authorized by the qualified electors." In 2006, electors in Teton County authorized a SPET for the "Teton County Housing Authority's Affordable Housing Program." The ballot further described the program as including "the acquisition, planning, improvement and financing of properties as allowed by law and to be utilized for affordable housing. . . ." More succinctly, the ballot authorized use of the SPET proceeds for the "acquisition . . . of properties . . . **to be utilized for affordable housing.**" The district court found that purpose to be satisfied if the Mantey property was to be used "either directly or indirectly" for an affordable housing project.

[¶ 33] The SPET ballot in Teton County specified that tax proceeds would go to acquire properties **to be utilized for affordable housing.** It did not specify that tax

---

**2.** No one offered a definition of "land banking" to the Court. From the use of this term in the record and briefs we conclude that "land banking" involves purchasing real estate with the hope that the land would either be used in the future or sold for a profit.

**3.** Typically a 12(b)(6) motion does not require nor rely upon an analysis of "the evidence." A motion to dismiss under W.R.C.P. 12(b)(6) is converted to a motion for summary judgment when the district court considers materials outside the pleadings. *Wilson v. Board of County Comm'rs of the County of Teton*, 2007 WY 42, ¶ 12, 153 P.3d 917, 921 (Wyo.2007). Here, however, Appellants attached exhibits to their complaint which included the facts mentioned by the district court.

proceeds could be used for property purchases which **indirectly** would be used for affordable housing. We find this distinction significant. The terminology of the ballot, "to be utilized for affordable housing" is plain and unambiguous. It authorizes the use of SPET proceeds to purchase land which will actually be used in an affordable housing project. On the other hand, the phrase "directly or indirectly" anticipates that property purchased by TCHA might not actually be used in an affordable housing project, but instead could be purchased as an investment. If the language "utilized for" meant "indirectly utilized for" then TCHA could use the tax proceeds for any speculative investments it chose, so long as ultimately, at some day in the unknown future, it "intended" to sell that investment and use the proceeds for affordable housing. Such a definition is incredible, and far beyond the realm of common sense or the express language of the ballot.

[¶ 34] The facts presented to the district court as exhibits to the complaint conflict as to whether the Mantey purchase is to be used as part of an affordable housing project, or only is of **indirect** use in financing some other land. The complaint, when read in the light most favorable to Appellants, alleges that the Mantey property is not to be utilized for affordable housing as authorized by the SPET ballot. Purchase of property for direct utilization in an affordable housing project was authorized by the 2006 SPET ballot; purchase of property for indirect utilization in an affordable housing project was not authorized. We reverse the district court's dismissal of this claim and remand it for a resolution of the factual conflict.

### B. Statutory Limits of Wyo. Stat. Ann. § 15–10–103(a)(viii).

[¶ 35] Appellants claim that TCHA's investment in land not intended for use in an affordable housing project violates Wyo. Stat. Ann. § 15–10–103(a)(viii). In their complaint, Appellants asserted that TCHA purchased the Mantey property as an **investment,** and not for use in a housing project. The court ruled that as a matter of law Wyo. Stat. Ann. § 15–10–103(a)(viii) does not pro-

hibit TCHA from investing in real estate and dismissed this claim under W.R.C.P. 12(b)(6).

[¶ 36] Wyo. Stat. Ann. § 15–10–103(a)(viii) grants counties with housing projects the authority to "invest any funds ... in property or securities in which savings banks may legally invest." Wyo. Stat. Ann. § 15–10–115(a) then recognizes that a county housing authority may exercise that same investment power. Consequently, TCHA could invest its funds in property or securities in which savings banks may legally invest.

[¶ 37] We find that Wyo. Stat. Ann. § 15–10–103(a)(viii) is unambiguous. It has only one reasonable meaning, and reasonable persons would agree on this meaning with consistency. The words "property" and "securities" are joined by the coordinate conjunction "or," and both are equally modified by the phrase that follows. Both "property" and "securities" are objects of the prepositional phrase "in which savings banks may invest." Consequently, under Wyo. Stat. Ann. § 15–10–103(a)(viii) TCHA could only invest in property if that property was such that a savings bank could invest in it.

[¶ 38] In this part of their Complaint, Appellants essentially made two assertions: 1) that TCHA purchased the Mantey property as an investment, and 2) that a savings bank could not have made such an investment purchase. We must consider those allegations as true when reviewing the dismissal under W.R.C.P. 12(b)(6). If those allegations are true, Appellants clearly had a valid claim. The district court erroneously dismissed this claim, believing that Wyo. Stat. Ann. § 15–10–103(a)(viii) permitted TCHA to invest in **any** property, whether a savings bank could make such an investment or not. We reverse the district court's dismissal of this claim under W.R.C.P. 12(b)(6).

### IV. Is TCHA entitled to mortgage property and pledge future tax receipts against debt?
#### A. Limits of Wyo. Stat. Ann. § 15–10–108.

[¶ 39] Appellants claimed TCHA borrowed funds to purchase the Mantey proper-

ty and then mortgaged that property, all in violation of Wyo. Stat. Ann. § 15–10–108. In this claim, Appellants argued that Wyo. Stat. Ann. § 15–10–108 authorizes borrowing and mortgages only for property that actually is used for a housing project. Because the Mantey property is an investment, and not intended for use in a housing project, Appellants assert that TCHA could not borrow against it under Wyo. Stat. Ann. § 15–10–108. The district court disagreed, and ruled that under Wyo. Stat. Ann. § 15–10–103 TCHA could borrow and mortgage, notwithstanding Wyo. Stat. § 15–10–108. The district court dismissed· this claim under W.R.C.P. 12(b)(6).

[¶ 40] Wyo. Stat. Ann. § 15–10–103 is a statute providing general authority for counties and municipalities with respect to ˙housing projects. It permits counties to acquire property "by any means" (Wyo.Stat.Ann. § 15–10–103(a)(iv)) and to "pledge" real property (Wyo.Stat.Ann. § 15–10–103(a)(v)). In general, this statute permits a county to purchase real property and to pledge it as security. Notably, this statute does not authorize a county to borrow.

[¶ 41] Wyo. Stat. Ann. § 15–10–108, on the other hand, is a more specific statute which authorizes borrowing and establishes conditions under which a county may borrow funds. It permits a county to borrow **for the purpose of financing housing for persons of low income** (Wyo.Stat.Ann. § 15–10–108(a)). In other words, this statute permits borrowing for a housing project. Such borrowing could be for purchasing land, construction of infrastructure, or building residential units for the project. The statute does not permit borrowing for investment or for any other purpose beyond developing a housing project.

[¶ 42] TCHA argues that the limitations of Wyo. Stat. Ann. § 15–10–108(a) only apply to borrowing for the specific purpose of building housing, and not to the acquisition of land. To support this argument, TCHA points to the first sentence of Wyo. Stat. Ann. § 15–10–108(a) which states that "a county may borrow funds ... for the

purpose of financing housing...." TCHA asserts that the term "for the purpose of financing housing" means actually building the housing units, and not to the acquisition of land, installation of utilities, paving or other items not related to actual living structures.

[¶ 43] We disagree with TCHA's reading of this statute. Taken as a whole, the statute is plain and unambiguous. The term "for the purpose of financing housing," in context, includes all of the activities and expenditures necessary to establish housing under a housing project. Land acquisition is one of those activities, when the land actually will be used in the project.

[¶ 44] We note that Wyo. Stat. Ann. § 15–10–108(a) and Wyo. Stat. Ann. § 15–10–111 [4] are the only statutes related to housing projects which authorize borrowing. No other statutes mention borrowing, and any borrowing by a housing authority such as TCHA must comply with the limits of Wyo. Stat. Ann. § 15–10–108.

[¶ 45] The district court incorrectly determined that Wyo. Stat. Ann. § 15–10–103 authorized TCHA to purchase land for any purpose and to borrow funds for any purpose. That statute does not authorize borrowing. Wyo. Stat. Ann. § 15–10–108, provides specific limitations on when borrowing may occur. A specific statute granting authority controls over a more general statute. *Qwest Corp. v. PSC of Wyoming,* 2007 WY 97, ¶ 32, 161 P.3d 495, 503 (Wyo.2007). Assuming that the allegations of Appellants' complaint are true—that the Mantey property is not part of a housing project, but instead was purchased as an investment—then Wyo. Stat. Ann. § 15–10–108 does not authorize borrowing to purchase that property. We must reverse the district court's dismissal of this claim.

### B. *Constitutional debt limitations.*

[¶ 46] Appellants raised a claim that TCHA's purchase of the Mantey property for $1.2 million, with over 95% of the purchase price borrowed, violated Article 16 §§ 3, 4, and 5 of the Wyoming Constitution. The district court ruled that Article 16 of the

**4.** Wyo. Stat. Ann. § 15–10–111 simply authorizes     a county to borrow from the federal government.

Wyoming Constitution does not apply to TCHA because it is not a political subdivision of the state. It also held that Wyo. Stat. Ann. § 15–10–108(c) precludes application of constitutional debt limits.

[¶ 47] Wyo. Stat. Ann. § 15–10–108(c) states that

> obligations issued under this chapter are payable solely from the sources provided in this section and do not constitute an indebtedness of the ... county within the meaning of any constitutional or statutory debt limitation or restriction and are not general obligations of the ... county.

[¶ 48] We disagree with the district court's conclusion that TCHA is a separate entity which is not a political subdivision. TCHA is simply an agent of Teton County. The Teton County Commissioners could exercise powers related to housing projects on their own, or they can appoint a board to exercise these powers on behalf of the county. Wyo. Stat. Ann. § 15–10–115. TCHA acts on behalf of Teton County. Teton County clearly is subject to the debt limits of Wyoming Constitution Article 16, §§ 3, 4, and 5.

[¶ 49] However, we find that debt properly incurred under the Housing Projects Statutes, Wyo. Stat. Ann. § 15–10–101 *et. seq.*, is not limited by Wyoming Constitution Article 16, §§ 3, 4, or 5. Article 16, § 3 of the Wyoming Constitution prohibits counties from incurring debt in excess of 2% of the county's assessed value. Article 16, § 4 of the Wyoming Constitution prohibits a county from incurring debt in excess of the taxes for the current year. Article 16, § 5 of the Wyoming Constitution provides that a county may not create debt exceeding 2% of the taxable property in the county. Each of these constitutional limits is connected to the taxable property or the tax income of the county. The purpose of these constitutional provisions is to prevent counties from encumbering their property tax revenues with too much debt.

[¶ 50] Here, any debt created by TCHA is unrelated to any property tax or tax assessments of Teton County. Wyo. Stat. Ann. § 15–10–108(c) clearly states that any debt for a housing project is **not** a debt of the county. No property tax revenues are available for payment of such debt. Instead, the debt may be paid "solely from the sources provided in this section."

[¶ 51] We previously have recognized that the debt limits of the Wyoming Constitution in Article 16, §§ 3, 4, and 5 do not apply to county or municipal debt which is not a general obligation of the county or municipality. In *Banner v. City of Laramie,* 74 Wyo. 429, 289 P.2d 922 (Wyo.1955), we held that Laramie's special improvement district debts which were to be paid exclusively from gasoline and cigarette excise taxes were not subject to the limits of Wyoming Constitution, Article 16. In *Banner,* we recognized a similar analysis from New Mexico in *State v. Connelly,* 39 N.M. 312, 46 P.2d 1097 (N.M. 1935) and *Stone v. City of Hobbs,* 54 N.M. 237, 220 P.2d 704 (N.M.1950), and we said

> The debt contemplated by the constitutional limitation was one for the payment of which the general faith and credit of the state or municipality was pledged, and to retire which the levy of a general property tax rather than an excise tax was contemplated.

*Id.* at 928, 289 P.2d 922.

[¶ 52] The Wyoming legislature apparently was cognizant of our holding in *Banner* when it passed the housing project statutes. Wyo. Stat. Ann. § 15–10–108(c) states:

> The obligations issued under this chapter are payable solely from the sources provided in this section and do not constitute an indebtedness ... within the meaning of any constitutional or statutory debt limitation ... and are not general obligations of the municipality or county.

Because any debt created by a housing authority under § 15–10–108 is not a general obligation and is payable only from sources other than the county's taxing authority, Article 16 §§ 3, 4, and 5 do not apply. The district court's dismissal of the Appellants' constitutional claims was appropriate, although the district court's analysis was incorrect.

## V. *Declaratory relief.*

[¶ 53] Appellants assert they should be able to present these issues to the district court in a declaratory relief action. They claim the district court required them to pursue administrative remedies rather than seeking declaratory relief. This assertion is not supported by the record. The district court did **not** require Appellants to pursue administrative remedies in lieu of declaratory relief. Rather, the district court found that the primary issue of investing in real estate "is an appropriate subject for declaratory relief in that it involves the agency's authority and the interpretation of the statutes underlying its actions."

## CONCLUSION

[¶ 54] We affirm the district court's summary judgment in Appellees' favor on claims based on the Public Meetings Act. We hold that the undisputed evidence shows that TCHA properly ratified its decision to purchase property. We also affirm the district court's dismissal of Appellants' claim that TCHA violated Wyoming Constitution debt limits.

[¶ 55] We reverse the district court's finding that discovery of minutes of TCHA's executive session on March 1, 2007, is moot. We also reverse the district court's dismissal of claims that TCHA's purchase of the Mantey property was beyond the scope of the SPET ballot and TCHA's purchase and financing of the Mantey property violated Wyo. Stat. Ann. § 15–10–103(a)(viii) and Wyo. Stat. § 15–10–108.

[¶ 56] Affirmed in part, reversed in part and remanded to the district court for further proceedings consistent with this opinion.