# IN THE SUPREME COURT, STATE OF WYOMING

## 2021 WY 128

### OCTOBER TERM, A.D. 2021

November 24, 2021

J. WILLIAM WINNEY, JR. and
LOUISE B. WINNEY,

Appellants
(Plaintiffs),

v.

THE HOBACK RANCHES
PROPERTY OWNERS
IMPROVEMENT AND SERVICE
DISTRICT a/k/a Hoback Ranches
Service and Improvement District and
MICHAEL TROY JERUP,

Appellees
(Defendants).

S-21-0057

*Appeal from the District Court of Sublette County*
The Honorable Marvin L. Tyler, Judge

*Representing Appellants:*
    Clark Stith, Rock Springs, Wyoming.

*Representing Appellee the Hoback Ranches Property Owners Improvement and Service District:*
    Stuart R. Day of Williams, Porter, Day & Neville, P.C., Casper, Wyoming.

*Representing Appellee Michael Troy Jerup:*
    Erica R. Day of Williams, Porter, Day & Neville, P.C., Casper, Wyoming.

*Before FOX, C.J., and DAVIS, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.

**KAUTZ, Justice.**

[¶1]    J. William Winney, Jr., and Louise B. Winney (the Winneys) reside in the Hoback Ranches subdivision in Sublette County, Wyoming.  They brought suit against the Hoback Ranches Property Owners Improvement and Service District (HRISD) and their neighbor, Michael Troy Jerup, alleging (1) HRISD illegally imposed annual property tax levies on the subdivision's landowners in excess of 8 mills; (2) HRISD violated the subdivision's protective covenants by installing wire fencing around the subdivision's perimeter; and (3) Mr. Jerup violated the covenants by conducting commercial activity on his property.  HRISD and Mr. Jerup filed a counterclaim against the Winneys alleging they violated the protective covenants by installing two wood posts set in concrete within a roadway easement.  The district court granted summary judgment to HRISD on the Winneys' claims against it; granted summary judgment to HRISD and Mr. Jerup on their counterclaim against the Winneys; and entered judgment in favor of Mr. Jerup on the Winneys' claim against him after a bench trial.  We conclude the district court erred in granting summary judgment to HRISD on the perimeter fence issue and reverse and remand with respect to that issue.  We affirm the district court's decision in all other respects.

## ISSUES

[¶2]    The Winneys raise four issues, which we restate as follows:

1.  Did the district court err in deciding HRISD's taxing authority was not limited by the 8 mill levy limitation contained in the Petition for Formation?

2.  Did the district court err in concluding HRISD was not bound by the protective covenants applicable to the Hoback Ranches subdivision, including their requirement that all fences be of buck and pole construction?

3.  Did the district court err in deciding HRISD had the authority to enforce the protective covenants' easement provision against the Winneys?

4.  Did the district court clearly err by finding Mr. Jerup had not conducted commercial activity upon his property?

## FACTS

### Creation of Subdivision and Protective Covenants

[¶3]    In 1976, Hoback Ranches, Inc., through its President Doyle F. Child, recorded a subdivision plat creating the Hoback Ranches, a 6,500-acre rural residential subdivision in Sublette County, Wyoming.  The subdivision's plat noted in relevant part:  "All road right-of-way widths are 66 feet, 33 feet either side of the shown centerline . . . .  Where no roads

1

are shown, access to tracts is to be along property lines." (Capitalization omitted). It also stated: "No public maintenance of roads." (Capitalization omitted).

[¶4]    On the same day Hoback Ranches, Inc., recorded the subdivision plat, it filed a "Declaration of Protective Covenants" applicable to the subdivision. The stated purposes of the covenants are "to insure the use of the property for attractive residential purposes, to prevent nuisances, to prevent the impairment of the attractiveness of the property, [and] to maintain the natural environment and protect the ecology of the area" thereby "secur[ing] to each tract owner the full benefit and enjoyment of his respective tract." Relevant here, the protective covenants provide:

> 1.    All lands covered by this deed shall be used for residential purposes only, and no commercial activity shall be conducted or permitted thereon.
> * * * *
> 9.    All fences shall be of buck and pole construction made of rough native timber. The buck shall be at least six feet tall and there shall be at least four poles on each span and each span can be no longer than 12 feet in width. The owner of each tract shall be responsible for erecting and maintaining a fence and gates around his respective tract if he desires to prevent the trespass of cattle or other livestock grazing or being ridden in the area.
> * * * *
> 20.    There are hereby reserved to grantors for the purpose of having adequate bridle paths, roadways, and utility easements to serve each tract, a perpetual easement 33 feet in width along each edge of the herein described tract[s], for the purpose of erecting, constructing, and maintaining bridle paths, roadways, and public utility facilities, both underground and overhead. Grantor hereby reserves the right to change, layout a new, or discontinue any roadway, bridle path, or utility easement, in its sole discretion, that would be beneficial in serving any tract in Hoback Ranches . . . .

[¶5]    The covenants state they "shall be perpetual and shall apply to and be forever binding upon the grantees hereof, [their] heirs, executors, administrators, and assigns, and are imposed upon the realty described herein as an obligation and charge against the same for the benefit of the grantor herein and the owners of each adjoining tract, their successors and assigns, and as a general plan for the benefit of said tract and all tracts in Hoback Ranches." They give Hoback Ranches, Inc., and the subdivision's landowners the authority to enforce the covenants by filing a lawsuit against the violator "either to prevent

2

him from doing so, or to recover damages, including costs and reasonable attorney fees, for such violation, or both."

### *Formation of HRISD*

[¶6]    For the first nine years of the subdivision's existence, Hoback Ranches, Inc., and/or Mr. Child paid to maintain and improve the subdivision's roads and perimeter fence and to keep hunters out of the subdivision.  In early 1985, Mr. Child informed the subdivision's landowners that beginning in 1986, he and Hoback Ranches, Inc., would no longer provide these services and recommended the formation of a property owners' improvement and service district with taxing authority.

[¶7]    A petition to form the improvement and service district ("Petition for Formation" or "Petition") was circulated to the subdivision's landowners.  The Petition requested the Sublette County Commissioners form and establish the district "for the maintenance of the perimeter fence[] around the boundary of the proposed District, for the protection from hunters within the proposed District and for the maintenance of roads which are located in the proposed District and road(s) leading from U.S. Highway 187 and 189 to the boundary line of the proposed District and from one part of the proposed District to another part of the proposed District."  It "proposed" the district be financed as follows:

> [Y]our petitioners request that a mill levy be assessed against the land within the proposed District sufficient to fund the improvement and services as hereinbefore proposed, the total amount of the assessment against the land located within the proposed District to be apportioned and assessed against the various lots and tracts of land located in the proposed District based upon the assessed valuation of said land and real property located within the proposed District as valued and used by the County Assessor for Sublette County in making assessment upon said land and real property for other taxes levied against said property by the County Assessor. *However, your petitioners request that a limit of eight (8) mills be imposed as the maxi[m]um amount of assessment which may be levied upon said property as aforementioned.*

(Emphasis added).

[¶8]    After the Petition for Formation was signed by the requisite number of landowners, the Sublette County Commissioners published notice they would be holding a public hearing concerning the Petition on August 20, 1985.  The record does not contain the

3

complete notice.[1]  From the information available, it provided the following as to the "Proposed Financing Arrangements" of the district:

> That a mill levy be assessed against the land within the proposed district sufficient to fund the [proposed] improvements and services . . ., the total amount of the assessment against the land located within the proposed district to be apportioned and assessed against the various lots and tracts of land located in the proposed district.

The notice did not contain any language indicating HRISD's taxing authority would be limited to 8 mills.

[¶9]    At the public hearing, the Sublette County Commissioners found "the establishment of the proposed district would serve the public convenience and necessity" in the subdivision.  They passed Resolution 86-85J establishing HRISD "for the purpose[s] of maintaining the perimeter fence[] around the boundary of [HRISD], of protecting [HRISD] from hunters, and of maintaining roads located in [HRISD] and road(s) leading from U.S. Highways 187 and 189 to the boundary line of [HRISD]."  HRISD's boundaries were the subdivision's boundaries.  The resolution called for an election by the subdivision's landowners to be held in August 1986 to decide whether to organize HRISD and to appoint an initial board of directors.  Resolution 86-85J did not mention how HRISD would be funded, let alone impose any limitation on its authority to collect revenue.[2]

---

[1] In their brief, the Winneys correctly state the notice indicated the hearing on the Petition for Formation would be held on August 20, 1985.  They then state:  "Time passed, and on July 1, 1986, the Sublette County Commissioners posted a notice of hearing on the Petition, stating that 'the petition as filed may be inspected at the office of the county commissioners . . . .'  That 'Notice of Hearing' listed no date, time, or place for the hearing."  For these statements, the Winneys appear to be relying on Exhibit 3 to their attorney's affidavit in support of their motions for partial summary judgment.  Exhibit 3 consists of two pages.  The first page is a notice of hearing on the Petition for Formation and contains four numbered paragraphs.  The second page is dated July 1, 1986, as the Winneys state in their brief, but does not appear to be a continuation of the first page (i.e., the notice of hearing on the Petition for Formation) for two reasons.  The second page is dated <u>after</u> the County Commissioners had already held the public hearing on the Petition for Formation and resolved to establish HRISD.  Additionally, the second page starts at Paragraph 7 and is in a different font than the first page.  Although not clear, it appears the second page is part of the notice provided of the August 1986 special election to decide whether to organize HRISD, rather than part of the notice of the August 1985 hearing on the Petition for Formation.

[2] The district court stated Resolution 86-85J did not impose any limit on HRISD's authority to levy taxes against the landowners but did outline the manner in which HRISD would derive its revenues whereby the "'owners of land within the [HRISD] shall be assessed on an acreage assessment, in order that the cost of any given project shall be shared equitably among property owners which are benefitted by the effort.'"  HRISD makes a similar statement in its brief.  The district court and HRISD are correct that Resolution 86-85J did not contain a limitation on HRISD's taxing authority but are incorrect in stating it addressed how HRISD would raise revenue.  The district court mistakenly quoted from the second page of Exhibit 3 to the

4

[¶10]   The Sublette County Clerk provided notice of the August 1986 election.  The notice identified the purposes of HRISD—to maintain the subdivision's perimeter fence and roads and to keep hunters out of the subdivision—and provided a list of nominees for the Board.  The notice also stated:   "If organized, the improvements and services as hereinbefore proposed will be financed by assessing a mill levy against the lands within the [HRISD]."  Again, the notice did not contain any language indicating HRISD's taxing authority was limited to 8 mills.  A majority of the subdivision's landowners voted to organize HRISD and elected a three-member Board of Directors.  Since that time, HRISD has operated through its Board.

[¶11]   In September 1995, Hoback Ranches, Inc., assigned HRISD the authority to enforce the protective covenants.  Hoback Ranches, Inc., and the landowners continued to have the right to enforce them.

### HRISD's Taxing History

[¶12]   From1986 through 2012, HRISD's Board of Directors imposed an annual mill levy of no more than 8 mills on the subdivision's landowners.  The levies were assessed by the County, and the subdivision's landowners paid them at the same time they remitted their property taxes to the County.  Once collected, the County turned over the tax proceeds from the levies to HRISD's Board.

[¶13]   In 2013, HRISD's Board of Directors acknowledged the Petition for Formation contained a statement that "there would be a maximum of eight mills that could be levied against a property in any given year" and noted "there is the perception that an eight . . . mill levy [cap] is in effect with respect to [HRISD]."  It passed a resolution stating it "is not restricted to an eight mill levy and may impose assessments to be equitably apportioned amongst the owners within [HRISD] in accordance with the benefits, following the adoption of a budget in accordance with Wyoming law."  Since then, HRISD's Board has levied an annual tax in excess of 8 mills on the subdivision's landowners.

### HRISD's Installation of Wire Fencing

[¶14] HRISD maintains the approximately 37 miles of fence along the boundary/perimeter of the subdivision.  A portion of its annual budget goes to repairing and/or replacing the perimeter fence.  When portions of the perimeter fence are replaced, HRISD uses wire fencing rather than buck and pole fencing.

Winneys' attorney's affidavit in support of their motions for partial summary judgment.  As explained above, *see supra* n. 1, the second page to Exhibit 3 appears to be the notice of election to organize the district; it is not Resolution 86-85J.

### The Winneys' Placement of Wood Posts

[¶15]  The Winneys' property in the subdivision is bordered on the south by Rim Road, which runs in an east-west direction and is maintained by HRISD, and on the east by Vista Ridge Lane, a platted easement running in a north-south direction which is not maintained by HRISD.  They access their property via Rim Road, which they also use to access the public highway.  Mr. Jerup's property is directly north of the Winneys' property.  He accesses his property using Vista Ridge Lane; it is the only access to his property, as well as for three other properties to the north of Mr. Jerup's property.  To leave the subdivision, Mr. Jerup travels south on Vista Ridge Lane, past the Winneys' residence, and turns either east or west onto Rim Road.  Both the Winneys and Mr. Jerup are year-round residents of the subdivision.

[¶16]  In the summer of 2015, the Winneys placed two wood posts set in concrete on their property in anticipation of installing a gate with an arch.  The posts are not located on Vista Ridge Lane as constructed but are within the Vista Ridge Lane easement.

### Mr. Jerup's Alleged Commercial Activity

[¶17]  Since its formation, HRISD has paid a homeowner in the subdivision to maintain the subdivision's roads because it would be more expensive to hire an outside party and it is imperative to have someone who lives nearby to respond to emergencies, such as a road being washed out.  Prior to 2015, HRISD paid subdivision landowners Woody and Sandy Caldwell to maintain the subdivision's roads with their personal motor grader.  In 2015, the Caldwells "retired" from this responsibility and placed their motor grader for sale.  Mr. Jerup purchased the grader from the Caldwells.  At the same time, HRISD sought bids from interested individuals to take over the road maintenance.

[¶18]  Mr. Jerup submitted a bid to HRISD which proposed a certain hourly charge based on the equipment used.  At the time he submitted the bid, he owned the motor grader, a tractor with a loader bucket, a backhoe, and a dump truck.  He stored these items on his property.  To fuel his equipment, Mr. Jerup has a 100-gallon diesel fuel tank on his property; the tank is filled once a month by an outside company.  HRISD awarded the road maintenance duties to Mr. Jerup.

[¶19]  Mr. Jerup performs road maintenance for HRISD one day per week in the summer. HRISD paid Mr. Jerup $2,250 in 2015; $27,190 in 2016; $16,682.50 in 2017; and $12,342 in 2018 for road maintenance.  On his 2015 and 2016 tax returns, Mr. Jerup reported income from HRISD for "[d]irt road maintenance" on an IRS form entitled "Schedule C, Profit or Loss From Business."  In 2015, he deducted the expense of purchasing the motor grader; in 2016, he depreciated the grader on his taxes.  In 2016, Mr. Jerup also deducted $3,855, the amount he paid Mr. Caldwell to help him with the road maintenance.

[¶20]  In August 2017, Mr. Jerup sold the motor grader to HRISD.  It remained for a time on Mr. Jerup's property.  At the time of the bench trial in January 2020, the grader had been moved to the subdivision's community parking lot for storage in the winter; however, it will be moved back to Mr. Jerup's property in the summer.

[¶21]  In May 2018, Mr. Jerup performed several hours of maintenance and repairs on the motor grader for HRISD.  HRISD paid him for his services and reimbursed him for the parts he purchased.  Mr. Jerup performed this work on his property.  In June 2019, Mr. Jerup began constructing a shop on his property to store his equipment.

[¶22]  HRISD does not snowplow or pay a third-party to snowplow the subdivision's roads.  When Mr. Jerup first purchased his property in 2007, the subdivision's landowners parked their vehicles on the public highway outside the subdivision and used snowmobiles to access their properties.  The Wyoming Department of Transportation (WYDOT) eventually prohibited them from parking on the highway so two subdivision residents began plowing the subdivision's roads.  Mr. Jerup eventually took over plowing for one of the resident plowers.

[¶23]  In 2007 or 2008, HRISD's Board of Directors created a Winter Committee, which solicits voluntary donations from landowners for snowplowing.  The Winneys have contributed to the Winter Committee.  Mr. Jerup is one of several landowners paid by the Winter Committee to snowplow the subdivision's roads.  He is mainly responsible for plowing Rim Road, which Mr. Jerup, the Winneys, and other landowners use to access the public highway from their properties.  When Mr. Jerup plows, he primarily uses his flatbed pick-up truck with a blade on the front; he takes the same truck to work during the winter to ensure access to and from his home.  Two or three times per year, he uses his dump truck, which has a blade attachment, and the motor grader to remove ice or to plow if there is heavy drifting.  All of the residents who plow snow for the Winter Committee, including Mr. Jerup, store their equipment on their properties.

[¶24]  Neither HRISD nor the Winter Committee pays Mr. Jerup or any other person to maintain and plow Vista Ridge Lane.  Mr. Jerup voluntarily maintains and plows Vista Ridge Lane so he can get to work each day and he and his neighbors to the north can safely access their properties.

### *This Lawsuit*

[¶25]  The Winneys brought suit against HRISD and Mr. Jerup, alleging, among other things:  (1) HRISD's imposition of annual property tax levies in excess of 8 mills was ultra vires because such action is outside the powers given to HRISD in the Petition for Formation; (2) HRISD violated the protective covenants by installing wire fencing around the subdivision's perimeter rather than buck and pole fencing; and (3) Mr. Jerup violated the covenants by conducting commercial activity on his property, to wit, a road grading

7

and snowplowing business. They sought (1) an injunction enjoining HRISD from imposing property tax levies greater than 8 mills and from installing fencing other than buck and pole fencing; and (2) an injunction enjoining Mr. Jerup from conducting commercial activity on his property and requiring him to remove the heavy equipment from his property. They also sought the attorney fees and costs they incurred in enforcing the protective covenants. HRISD and Mr. Jerup filed a counterclaim against the Winneys, alleging, *inter alia*, the Winneys' placement of the wood posts within the Vista Ridge Lane easement violated the protective covenants.

[¶26] The parties filed cross-motions for summary judgment. The district court granted summary judgment to HRISD on the Winneys' claims against it. It concluded HRISD's taxing authority was not limited to 8 mills despite the language of the Petition for Formation and HRISD was not bound by the protective covenants, including their requirement that all fences be of buck and pole construction, because they applied only to the subdivision's landowners and HRISD does not own any land within the subdivision. It also found the covenants were silent regarding the subdivision's perimeter fence. The court granted summary judgment to HRISD and Mr. Jerup on their counterclaim against the Winneys because the Winneys' placement of the wood posts within the Vista Ridge Lane easement violated the covenants. It ordered the Winneys to remove the posts and enjoined them from placing any permanent obstructions in the easement or otherwise unreasonably interfering with the use of the easement. The court denied the parties' summary judgment motions with respect to whether Mr. Jerup violated the covenants by conducting commercial activity on his property, concluding the covenants were "vague and ambiguous when evaluating whether [Mr.] Jerup's activities upon his property violate the intent of the [p]rotective [c]ovenants" and material questions of fact remained in dispute. (Emphasis in original). That issue proceeded to a two-day bench trial. After the trial, the court found and concluded that other than Mr. Jerup's "*de minimis* technical violation" of the covenants when he maintained and repaired the motor grader on his property for HRISD in May 2018, Mr. Jerup had not conducted "commercial activities upon his property" in violation of the covenants. It entered judgment accordingly. The Winneys appealed.

[¶27] Additional facts will be set out, as necessary, in the discussion of the issues.

## DISCUSSION

### A. HRISD's Taxing Authority

[¶28] The Winneys argue the district court erred in concluding HRISD's authority to levy taxes was not limited to 8 mills as outlined in the Petition for Formation. They say it is immaterial that Resolution 86-85J does not contain an 8 mill levy cap because the Sublette County Commissioners had no authority to set a mill levy or change the mill levy outlined in the Petition for Formation. They assert the Commissioners' powers were limited to approving or denying the Petition for Formation; setting the district's boundaries; naming

8

it; and modifying the terms and conditions proposed for the control of the district or conditioning their approval on subsequent events. The Winneys also argue it is impossible to know whether the 1986 ballot to organize HRISD contained the 8 mill levy limitation because the parties were unable to find a copy of the ballot and there was no evidence concerning its language. Finally, the Winneys tell us that to ignore the "method of financing" outlined in the Petition would (1) render meaningless the statutory requirement that petitions for formation contain a "method of financing," (2) mean that none of the other terms of the Petition for Formation have any legal effect, including the Petition's language limiting the purposes and powers of HRISD to maintaining the subdivision's roads and perimeter fences and keeping hunters out of the subdivision, and (3) violate the "social contract" formed by the landowners in signing the Petition.

[¶29] Our review of the district court's order granting summary judgment to HRISD is de novo. *Wyoming Jet Ctr., LLC v. Jackson Hole Airport Bd.*, 2019 WY 6, ¶ 10, 432 P.3d 910, 914 (Wyo. 2019) (quoting *Reichert v. Daugherty*, 2018 WY 103, ¶ 11, 425 P.3d 990, 994 (Wyo. 2018)) (other citations omitted). "'We also review de novo a district court's interpretation of a statute.'" *Wyo. State Hosp. v. Romine (Romine)*, 2021 WY 47, ¶ 24, 483 P.3d 840, 847 (Wyo. 2021) (quoting *Black Diamond Energy of Del., Inc. v. Wyo. Oil & Gas Conservation Comm'n*, 2020 WY 45, ¶ 10, 460 P.3d 740, 744 (Wyo. 2020)).

[¶30] At the time HRISD was formed, the Improvement and Service District Act (Act), which is currently codified at Wyo. Stat. Ann. §§ 18-12-105 to 18-12-141 (LexisNexis 2021), required "[p]roceedings for the formation of a district" to be "commenced by filing a petition addressed to the commissioners of the county in which the land proposed to be included in the district is situated." 1977 Session Laws, ch. 172 § 1. The petition for formation was to (1) "[s]tate the proposed name for the district"; (2) "[s]et forth the boundaries of the district and describe the lands situated therein"; (3) "[r]equest that a district be formed under this act"; (4) "[d]escribe generally the improvements proposed to be acquired or constructed and operated and the services to be furnished to inhabitants of the district"; (5) "[d]etail the proposed method for financing the improvements or services"; and (6) "[n]ominate three . . . persons . . . to serve as the initial board of directors of the district." *Id*. Once the petition for formation was filed with the county commissioners, the commissioners were to "fix a time and place" for a hearing on the petition and publish notice thereof. *Id*. The notice was to provide, *inter alia*, "[a] description of the proposed financing arrangements." *Id*. If, after the hearing, the commissioners found "that the establishment of the proposed district would serve the public convenience and necessity in that area and that the petition had been properly presented," they were to "adopt a resolution to establish the formation of the district," "call an election on the organization of the district," "establish and describe the [district's] boundaries," and "designate a name for the district." *Id*.; 1981 Session Laws, ch. 157, § 2. The commissioners could choose the name "proposed in the petition [for formation] or any other name [they] select[ed]." 1977 Session Laws, ch. 172 § 1. They could also "modify

9

the terms and conditions proposed for the control of the district or condition their approval upon subsequent events." *Id*.

[¶31] Section 18-12-122 required the county commissioners to publish notice of the election to organize the district; the notice was to contain (1) "the information listed in the petition for formation," (2) "the names of any persons nominated as directors in addition to those named in the petition," and (3) "the time, date and polling place or places for the election." 1981 Session Laws, ch. 157, § 2. At the election, the voters were to "vote for or against the organization of the district" and "for three . . . persons to serve as the board of directors of the district, if organized." *Id*. If a majority of the votes were in favor of organization, the county commissioners were to declare the district organized. *Id*. Once organized, a district was to be "managed and controlled" by a three-member elected Board. *Id*.

[¶32] Under this statutory framework, a petition for formation had no legal effect other than to begin the process to form an improvement and service district. As its name implies, a "petition" for formation of a district is simply a "formal written request" to the county commissioners to form the district; it does not establish or organize a district. *See* https://www.merriam-webster.com/dictionary/petition (defining "petition" as "a formal written request made to an authority or organized body"). *See also,* Petition, Black's Law Dictionary (11th ed. 2019) ("petition" means "[a] formal written request presented to a court or other official body"). The Petition for Formation in this case simply "request[ed]" the Sublette County Commissioners form the district; "proposed" a name for the district; "proposed" the district's boundaries; "proposed" the services the district would provide; "proposed" a method of financing; "request[ed]" the "proposed" district be financed by a mill levy; and "request[ed]" the mill levy be limited to 8 mills. (Capitalization omitted).

[¶33] The Sublette County Commissioners established HRISD via Resolution 86-85J after holding a public hearing and finding "the establishment of the proposed district would serve the public convenience and necessity in the area specified in the petition." A majority of the landowners voted to organize HRISD in the 1986 election. Resolution 86-85J does not contain any limitation on HRISD's taxing authority. In fact, it is completely silent with respect to how HRISD would derive its revenues. Similarly, although the language used on the 1986 election ballot is not in the record, the published notice of the election simply stated that if the voters chose to organize HRISD, it would be "financed by assessing a mill levy against the lands within the [HRISD]." The notice did not mention the 8 mill levy cap. Moreover, the statute pertaining to organization of a district required the voters to simply "vote for or against the organization." 1981 Session Laws, ch. 157, § 2.

[¶34] None of the terms of the Petition for Formation controlled HRISD after it was established by the Commissioners and organized by the landowners. HRISD's authority is defined by Resolution 86-85J, its organizational documents, and the Act. As we stated above, Resolution 86-85J does not contain an 8 mill levy cap, and the Winneys have never

10

alleged any such limit is contained within HRISD's organizational documents. The Act did not and does not impose any mill levy limitation on improvement and service districts. Notably, the Wyoming legislature expressly imposed mill levy limits for other types of districts, including special museum districts, solid waste disposal districts, hospital districts, and special cemetery districts. *See* Wyo. Stat. Ann. §§ 18-10-213(b) (LexisNexis 2021) (special museum districts), 18-11-103(a) (LexisNexis 2021) (solid waste disposal districts), 35-2-414(b) (LexisNexis 2021) (hospital districts), 35-8-314(b) (LexisNexis 2021) (special cemetery districts). The fact that the legislature did so with respect to these districts but not for improvement and service districts demonstrates the legislature knew how to impose a mill levy cap had it wanted to and its failure to do so for improvement and service districts was intentional. *Rodriguez v. Casey*, 2002 WY 111, ¶ 10, 50 P.3d 323, 327 (Wyo. 2002) ("We presume that the legislature acts intentionally when it uses particular language in one statute, but not in another.") (citations omitted). *See also*, *Romine*, ¶ 29, 483 P.3d at 848 ("The use of the term 'malpractice claims' in the Medical Review Panel Act demonstrates the legislature knew how to limit the scope of a statute to malpractice claims. It did not include any such limitation in § 1-39-110 and we are not at liberty to read one into it."); *United States v. Burkholder*, 816 F.3d 607, 615 (10th Cir. 2016) (the fact Congress explicitly included proximate-cause language in other criminal penalty-enhancement statutes shows Congress "clearly knew how to add a proximate-cause requirement in criminal penalty-enhancement statutes when it wished to do so" and its failure to include such language in 21 U.S.C. § 841(b)(1)(E) suggests its omission was intentional).

[¶35]  Not only does the Act not impose a mill levy or other cap on an improvement and service district's authority to tax, it explicitly allowed and continues to allow a district the power to *"[e]stablish and collect charges for* water, sanitation and related services and *the use of improvements or services provided by the district*, *including authority to change the amount or rate thereof,* and to pledge the revenues therefrom for the payment of district indebtedness." 1977 Session Laws, ch. 173, § 1; Wyo. Stat. Ann. § 18-12-112(a)(viii) (emphasis added). As the district court aptly stated, this statute reflects the reality that a district's costs "to provide services are not static, and they are subject to change as the board of directors may, from time-to-time, deem appropriate."

[¶36]  Moreover, at the time HRISD was established, § 18-12-107 required a petition to form a district to "[d]etail the proposed *method* for financing the improvements or services." 1977 Session Laws, ch. 173, § 1 (emphasis added). The plain meaning of "method" is "a procedure or process for attaining an object." *See* https://www.merriam-webster.com/dictionary/method. The "procedure or process" for financing improvements and services is the <u>means</u> by which these items will be funded, not the <u>amount</u> of financing. While it was proper for the Petition for Formation to contain the means by which HRISD would be funded, i.e., a mill levy, any amount or limitation on that funding was superfluous.

11

[¶37] Because the landowners were on notice that any district formed would have the authority to collect revenue and to "change the amount or rate thereof" and there was no statutory authority for a mill levy limit to be included in the Petition for Formation, we reject the Winneys' argument that the Petition constituted a "social contract" binding on HRISD. For their "social contract" argument, the Winneys primarily rely on *Gronberg v. Teton Cnty. Housing Auth.*, 2011 WY 13, 247 P.3d 35 (Wyo. 2011). *Gronberg* is inapposite.

[¶38] Voters in Teton County approved a sales tax, known as a Special Purpose Excise Tax, to fund $5 million for the Teton County Housing Authority's (TCHA) "'[a]ffordable [h]ousing [p]rogram . . . which shall include the acquisition . . . of properties . . . *to be utilized for affordable housing . . . .*'" *Gronberg*, ¶ 5, 247 P.3d at 38 (emphasis added). The TCHA used the tax proceeds to purchase property to be used either directly for an affordable housing project or indirectly as an investment which could eventually be sold, with the sale proceeds used for affordable housing. *Id.*, ¶¶ 6, 33, 247 P.3d at 38, 43-44. We concluded to the extent the TCHA's purchase of the property was to serve as an investment, it was unlawful because Wyo. Stat. Ann. § 39-15-204(a)(iii) (LexisNexis 2021) required special purpose excise tax proceeds to be used "'for specific purposes authorized by the qualified electors.'" *Id.*, ¶¶ 32, 34, 247 P.3d at 43-44 (quoting § 39-15-204(a)(iii)). We concluded the voters authorized the tax proceeds "to be utilized for affordable housing," which required TCHA to use the tax proceeds to purchase land which would be directly used for affordable housing and not indirectly as an investment. *Id.*, ¶¶ 33-34, 247 P.3d at 43-44.

[¶39] Here, unlike in *Gronberg*, there is no evidence an 8 mill levy limit was placed on the ballot to organize the district in 1986. Moreover, there is no statute imposing a limit on an improvement and service district's taxing authority. Rather, the Act specifically allowed and continues to allow a district to change the amount or rate it charges for the use of the improvements and services it provides. 1977 Session Laws, ch. 173, § 1; Wyo. Stat. Ann. § 18-12-112(a)(viii).

[¶40] The Winneys argue if the "method of financing" contained in the Petition for Formation does not control, then the requirement that a petition to form a district contain a "method for financing" is rendered superfluous and none of the other terms of the Petition have any legal effect, including the Petition's language limiting the purposes and powers of HRISD to maintaining the subdivision's roads and perimeter fence and keeping hunters out of the subdivision. According to them, this means HRISD could exercise any of the powers authorized under the Act, including constructing a bridge, golf course, or swimming pool. They claim this is a nonsensical result.

[¶41] There are two problems with the Winneys' argument. First, that the method of financing contained in the Petition for Formation has no legal effect after the Sublette County Commissioners resolved to establish HRISD and the landowners voted to organize

12

it does not render superfluous the requirement that a petition to form a district contain a "method for financing." At the time HRISD was formed, a "method for financing" was required to be contained in the petition and a petition was required to start the process to form a district. *See* 1977 Session Laws, ch. 173, § 1. Notably, although the Act continues to require a petition for formation to begin the process to form a district, *see* § 18-12-105, it no longer requires the petition to include any of the information required when HRISD was formed, including a "method for financing." 1998 Session Laws, ch. 115, § 5.

[¶42] Second, the fact that none of the terms of the Petition for Formation have any legal effect other than that they were required to be included in the petition and the petition was necessary to start the process to form a district does not lead to an absurd result. Resolution 86-85J sets forth the "purposes" of HRISD—to maintain the subdivision's perimeter fence and roads and keep hunters out of the subdivision. Because the Resolution controls, there is no need to rely on the Petition for Formation for HRISD's "purposes." Moreover, the Winneys confuse a district's "purposes" with its "powers." Section 18-12-112 outlines the "powers" of a district. Those powers include, as noted above, the authority to "[e]stablish and collect charges for . . . the use of improvements or services provided by the district, including the authority to change the amount or rate thereof." Section 18-12-112(a)(viii). They also include the authority to (1) "[h]ave and use a corporate seal"; (2) "[s]ue and be sued, and be a party to suits, actions and proceedings"; (3) "[e]nter into contracts for the purpose of providing any authorized improvements and the maintenance and operation thereof, or otherwise to carry out the purposes of the district"; (4) "[a]ccept from any public or private source grants, preferred loans, contributions and any other benefits available for use in the furtherance of its purposes"; (5) "[a]cquire and own or lease real or personal property, including easements and rights-of-way, within or without the district for district purposes"; (6) "[p]rovide for public recreation by means of parks, including but not limited to playgrounds, golf courses, swimming pools or recreation buildings"; and (7) "[p]rovide for the construction . . . of bridges, culverts, curbs, gutters, drains and works incidental to any street improvement." Section 18-12-112(a)(i), (ii), (iii), (iv), (ix), (xv), (xviii). Some of a district's "powers" are statutorily limited by its "purposes," e.g. a district's authority to obtain grants, loans, contributions or other benefits, and its power to obtain real property in or outside the district. Section 18-12-112(a)(iv), (ix). However, a district's statutory powers to do some other things, such as to provide for public recreation, including a golf course and swimming pool, and to construct bridges, are not so limited. Section 18-12-112(a)(xv), (xviii). As a result, HRISD has the "power" to provide these things. Of course, that does not mean its Board will exercise that power.

[¶43] The district court correctly decided HRISD's taxing authority was not limited to the 8 mill levy limitation outlined in the Petition for Formation.

## B. HRISD's Alleged Violation of Covenant Regarding Fences

[¶44] The Winneys argue the district court erred in determining the protective covenants did not apply to HRISD. According to them, the covenants apply to HRISD because it has the authority to enforce them. The Winneys also maintain the district court erred in finding the covenants were silent with respect to the subdivision's perimeter fence. They claim the covenants require "all fences" to be of buck and pole construction, including the subdivision's perimeter fence. Moreover, the covenants apply to the "realty described therein," which means the entire subdivision, including its perimeter.

[¶45] Again, our review of the district court's summary judgment decision is de novo. *Wyoming Jet Ctr., LLC*, ¶ 10, 432 P.3d at 914 (quoting *Reichert*, ¶ 11, 425 P.3d at 994) (other citations omitted). We also review de novo the district court's interpretation of the protective covenants. *Gumpel v. Copperleaf Homeowners Ass'n, Inc.*, 2017 WY 46, ¶ 25, 393 P.3d 1279, 1289 (Wyo. 2017) (citing *Wimer v. Cook*, 2016 WY 29, ¶ 21, 369 P.3d 210, 218 (Wyo. 2016)).

[¶46] "Covenants are contractual in nature and we therefore interpret them as we would a contract." *Id.*, ¶ 29, 393 P.3d at 1290 (citing *Wimer*, ¶ 22, 369 P.3d at 218) (other citation omitted). Our goal is "'to determine and effectuate the intention of the parties, especially the grantor or declarant,'" in this case Hoback Ranches, Inc. *Wimer*, ¶ 22, 369 P.3d at 218 (quoting *Omohundro v. Sullivan*, 2009 WY 38, ¶ 9, 202 P.3d 1077, 1081 (Wyo. 2009)).

[¶47] As with any contract interpretation, we begin with a covenant's plain language:

> [T]he words used in the [covenant] are afforded the plain meaning that a reasonable person would give to them. *Doctors' Co. v. Insurance Corp. of America*, 864 P.2d 1018, 1023 (Wyo. 1993). When the provisions in the [covenant] are clear and unambiguous, the court looks only to the "four corners" of the document in arriving at the intent of the parties. *Union Pacific Resources Co. [v. Texaco]*, 882 P.2d [212], 220 [(Wyo. 1994)]; *Prudential Preferred Properties [v. J and J Ventures]*, 859 P.2d [1267,] 1271 [(Wyo. 1993)].

*Gumpel*, ¶ 29, 393 P.3d at 1290 (quoting *Thornock v. PacifiCorp*, 2016 WY 93, ¶ 13, 379 P.3d 175, 180 (Wyo. 2016)).

[¶48] A restrictive covenant is ambiguous "only if it 'is obscure in its meaning, because of indefiniteness of expression, or because a double meaning is present.'" *Reichert*, ¶ 16, 425 P.3d at 995 (quoting *Fix v. Forelle*, 2014 WY 79, ¶ 16, 327 P.3d 745, 749 (Wyo. 2014), and *Fayard v. Design Comm. of Homestead Subdivision*, 2010 WY 51, ¶ 12, 230 P.3d 299, 303 (Wyo. 2010)). In the absence of an ambiguity, "we adhere to the covenant's 'plain and ordinary meaning without reference to attendant facts and circumstances or extrinsic

evidence.'" *Id.* (quoting *Star Valley Ranch Ass'n v. Daley*, 2014 WY 116, ¶ 12, 334 P.3d 1207, 1210 (Wyo. 2014), and *Anderson v. Bommer*, 926 P.2d 959, 961-62 (Wyo. 1996)).

[¶49] The relevant protective covenant states:

> All fences shall be of buck and pole construction made of rough native timber. The buck shall be at least six feet tall and there shall be at least four poles on each span and each span can be no longer than 12 feet in width. The owner of each tract shall be responsible for erecting and maintaining a fence and gates around his respective tract if he desires to prevent the trespass of cattle or other livestock grazing or being ridden in the area.

The covenant is not indefinite or subject to multiple meanings. It states "all" fences are to be of buck and pole construction. "'All' means everything." *P & N Investments, LLC v. Frontier Mall Assocs., LP*, 2017 WY 62, ¶ 17, 395 P.3d 1101, 1105 (Wyo. 2017). *See also*, https://www.merriam-webster.com/dictionary/all (defining "[a]ll" as "the whole amount, quantity, or extent of" and "every"). The covenant requires every subdivision fence to be of buck and pole construction. It does not state it applies only to interior fences nor does it specifically exclude the subdivision's perimeter fence from its reach.

[¶50] The protective covenants only burden the subdivision's landowners. The covenants state: "The property that you purchase from Hoback Ranches [Inc.] will be subject to the following protective covenants, and the deed will recite: 'The above described property is subject to the following protective covenants which shall be deemed covenants running with the land *and binding upon the grantees [(subdivision's landowners)] and their successors in interest*.'" (Emphasis added). They also provide:

> Said Protective Covenants, conditions, restrictions, and reservations shall be perpetual and shall apply to and be forever *binding upon the [landowner], his heirs, executors, administrators, and assigns*, and *are imposed upon the realty described herein as an obligation and charge against the same* for the benefit of the grantor herein [(Hoback Ranches, Inc.)] and the owners of each adjoining tract, their successors and assigns, and as a general plan for the benefit of said tract and all tracts in Hoback Ranches."

(Emphasis added). It is undisputed that HRISD does not own any land in the subdivision. The problem, however, is that the subdivision's perimeter fence is located on the property of the subdivision's landowners, who are bound by the covenants.

15

[¶51] Gary Ryan, a subdivision landowner and a former director of HRISD's Board, testified: "[The subdivision's perimeter fence is] constructed on the property line between [the Bureau of Land Management (BLM)] and [the subdivision] or forest service [land] and [the subdivision]. And the residents that have [the subdivision's perimeter fence on their property] are well aware of what's going on." When asked if he believes any of the subdivision's perimeter fence has been built on property "physically outside the . . . subdivision," he stated the question was "impossible to answer, because the boundary lines are based on old surveys." Nevertheless, he stated the Board "does not intend to have [the subdivision's perimeter] fence[] constructed on property that's outside the boundaries of the . . . subdivision." Bruce Bartley, another subdivision landowner and Chairman of HRISD's Board in 2018, testified a substantial portion of the subdivision's southern boundary and a small portion of its western boundary were fenced by a subdivision landowner at his own expense. Mr. Bartley stated the fence was on the landowner's private property. Because the subdivision's perimeter fence is located on landowners' property and the covenants are binding on those landowners, the buck and pole fence covenant applies to the subdivision's perimeter fence. It is undisputed that HRISD has never installed buck and pole fencing.

[¶52] The district court found it material that HRISD is "a separate entity and a political subdivision of the state," *see* Wyo. Stat. Ann. § 18-12-103(b) (LexisNexis 2021), and was specifically established to maintain the subdivision's perimeter fence. We fail to see the relevance of these facts absent any legal authority that the State is immune from following protective covenants or any evidence HRISD was specifically exempted from following the protective covenants. When the landowners established HRISD to maintain the subdivision's perimeter fence, they effectively directed it to maintain that fence on their behalf. HRISD has no independent ownership of the perimeter fence or the land it is on.

[¶53] HRISD offers an alternative argument to support judgment in its favor. It claims it would be inequitable to enforce the buck and pole fencing covenant. It says the subdivision borders BLM and United States Forest Service (USFS) land and is also part of an animal migration route. As a result, it coordinates with these agencies on fencing issues and has installed wire fencing around the subdivision's perimeter which complies with the BLM and Wyoming Game and Fish Department's rules and is wildlife friendly.

[¶54] Under certain circumstances it may be inequitable to enforce a protective covenant. *Kindler v. Anderson*, 433 P.2d 268, 270 (Wyo. 1967) (citation omitted). A protective covenant will not be enforced if it is against public policy that is "well settled, unambiguous and not in conflict with another public policy equally or more compelling." *Arychuk v. Star Valley Ass'n*, 997 P.2d 472, 479 (Wyo. 2000) (citations omitted). "Changes in the character of a neighborhood may [also] result in the discharge of a restrictive covenant, where the change is such that it is no longer possible to accomplish the original purpose intended by such restrictions." 20 Am. Jur. 2d *Covenants, Conditions, and Restrictions* § 234 (footnotes omitted). "No hard-and-fast rule can be laid down as to when changed

conditions have defeated the purpose of a restriction, and the inquiry depends upon the facts and circumstances presented in each case. The issue of whether and when a change in the character of a neighborhood has occurred, so as to entitle a property owner to relief from restrictive covenants, is a question of fact." *Id.* § 235 (footnotes omitted). Finally, a protective covenant may be "abandoned by failure to enforce it when it is violated, the violations are ignored or acquiesced to, and the violations are 'so great, or so fundamental or radical as to neutralize the benefits of the restriction to the point of defeating the purpose of the covenant. In other words, the violations must be so substantial as to support a finding that the usefulness of the covenant has been destroyed, or that the covenant has become valueless and onerous to the property owners.'" *Steiger v. Happy Valley Homeowners Ass'n*, 2010 WY 158, ¶ 29, 245 P.3d 269, 277-78 (Wyo. 2010) (quoting *Hammons v. Table Mountain Ranches Owners Ass'n, Inc.*, 2003 WY 85, ¶ 14, 72 P.3d 1153, 1156 (Wyo. 2003)) (other citation omitted).

[¶55]  HRISD raised its alternative argument below, but the district court decided it was unnecessary to address because the covenants did not apply to HRISD. While we may affirm the district court on any ground apparent in the record, we decline to do so in this case. *See Campbell Cnty. Mem'l Hosp. v. Pfeifle*, 2014 WY 3, ¶¶ 30-31, 317 P.3d 573, 581 (Wyo. 2014) (citation omitted). HRISD's alternative argument involves "complex factual and legal issues" best left for the district court to address in the first instance on remand. *Id.*

## C.  The Winneys' Alleged Violation of Covenant Regarding Roadway Easement

[¶56]  The Winneys argue the district court erred in granting summary judgment to HRISD on its counterclaim against them because, although Hoback Ranches, Inc., assigned HRISD the authority to enforce the protective covenants in 1995, that authority was no longer valid as of July 1, 2017, when § 18-12-141 became effective. According to them, because the right to enforce the covenants is a new "service" to be provided by HRISD not mentioned in the Petition for Formation, § 18-12-141 required it to be approved by a majority of the landowners after an election. The Winneys state there has been no such election and therefore HRISD does not have the authority to enforce the covenants, including their easement provision.

[¶57]  The Winneys' argument ignores that Mr. Jerup was also awarded summary judgment on this claim, and they have not appealed from that award. Moreover, the Winneys did not raise this argument in the district court, even though § 18-12-141 had been in existence for over a year when they made their arguments in the district court. "'Issues raised for the first time on appeal generally will not be considered by this court unless they are jurisdictional or issues of such a fundamental nature that they must be considered.'" *Gjertsen v. Haar,* 2015 WY 56, ¶ 15, 347 P.3d 1117, 1123 (Wyo. 2015) (quoting *Byrd v. Mahaffey,* 2003 WY 137, ¶ 10, 78 P.3d 671, 674 (Wyo. 2003)). The Winneys' argument is neither jurisdictional nor fundamental and will not be considered.

17

### D. Mr. Jerup's Alleged Violation of Covenant Regarding Commercial Activity

[¶58] The Winneys argue the district court clearly erred in finding Mr. Jerup used his property for residential purposes only and not for commercial purposes. They claim the trial evidence showed Mr. Jerup has operated a road maintenance and snowplowing business since 2015 and stores his business equipment on his property. He also maintains and refuels his equipment on his property; depreciates this equipment on his taxes, which he could not do unless the equipment is placed in service in connection with a trade or business activity; claimed a business expense for his purchase of the motor grader on his 2015 taxes, which he could not do unless the grader was acquired for use in the active conduct of a trade or business; built a shop on his property to store his equipment; and moved equipment along Vista Ridge Lane 377 times between 2017-2019. The Winneys also fault the district court for finding that because Mr. Jerup's road maintenance activities occur away from his property, commercial activity is not conducted on his property. They claim Mr. Jerup's use of his property as the staging area from which his trucks are dispatched and his construction of a large building on his property to store his equipment are sufficient to show commercial activity occurs on his property.

[¶59] The relevant protective covenant provides: "All lands covered by this deed shall be used for residential purposes only, and no commercial activity shall be conducted or permitted thereon." The covenants do not define the terms "residential purposes" or "commercial activity." At the summary judgment stage, the district court decided these terms were ambiguous but concluded that under its plain language, the covenant controlled only Mr. Jerup's activities <u>upon</u> his property.

[¶60] Once it decided the covenant was ambiguous, the district court was required to examine the extrinsic evidence presented at the bench trial to determine the parties' intent in creating the covenant. *Gayhart v. Corsi*, 2020 WY 58, ¶ 15, 462 P.3d 904, 909 (Wyo. 2020) (when a covenant is ambiguous, the court looks to extrinsic evidence to ascertain the parties' intent). The court did not expressly do so. However, in finding that Mr. Jerup's maintenance and repair of the motor grader in May 2018 constituted a *de minimis* technical violation of the covenants prohibiting commercial activity upon his property, the court determined such conduct was the only instance where Mr. Jerup "rendered services or performed work for others for payment [upon his property]." As a result, it appears the court decided the covenant prohibiting commercial activity prevented Mr. Jerup from rendering services or performing work on his property for others for profit.

[¶61] The parties do not challenge the district court's determination that the covenant is ambiguous or its apparent interpretation of the covenant. Indeed, the Winneys' arguments on appeal are couched solely as challenges to the district court's factual findings. Normally, we review a district court's factual findings following a bench trial for clear error, reversing only if we are left with a "definite and firm conviction that a mistake has

18

been committed." *Davis v. Harmony Dev., LLC*, 2020 WY 39, ¶ 31, 460 P.3d 230, 240 (Wyo. 2020) (quoting *Ekberg v. Sharp*, 2003 WY 123, ¶ 10, 76 P.3d 1250, 1253 (Wyo. 2003)) (other citations omitted). "However, '[r]eviewing courts are free to make a determination as to the existence of ambiguity whether or not the parties agree one way or the other and whether or not the trial court has reached a conclusion one way or the other.'" *Felix Felicis, LLC v. Riva Ridge Owners Ass'n*, 2016 WY 67, ¶ 16, 375 P.3d 769, 774 (Wyo. 2016) (quoting *Cathcart v. State Farm Mut. Auto Ins. Co.*, 2005 WY 154, ¶ 18, 123 P.3d 579, 588 (Wyo. 2005)). We review de novo the district court's construction and interpretation of the covenant, including its determination that it is ambiguous. *Id.* (citations omitted).

[¶62] As stated above, in interpreting a covenant, our job is to determine and effectuate the intention of the parties, especially the grantor, Hoback Ranches, Inc. *Wimer*, ¶ 22, 369 P.3d at 218 (citation omitted). We start with the covenant's plain language to determine that intent. *Gumpel*, ¶ 29, 393 P.3d at 1290 (citations omitted). "Intention of the parties is to be determined from the entire context of the instrument, and not from a single clause." *Felix Felicis, LLC,* ¶ 18, 375 P.3d at 775 (citations and quotations omitted). If the language used is unambiguous, we adhere to the covenant's plain and ordinary meaning without resort to extrinsic evidence. *Reichert*, ¶ 16, 425 P.3d at 995 (citations omitted).

[¶63] Hoback Ranches, Inc., explicitly stated that the purposes of the protective covenants are "to insure the use of the property for attractive residential purposes, to prevent nuisances, to prevent the impairment of the attractiveness of the property, [and] to maintain the natural environment and protect the ecology of the area" thereby "secur[ing] to each tract owner the full benefit and enjoyment of his respective tract." To that end, the covenants require, among other things, "[a]ll lands covered by this deed [to] be used for residential purposes only, and no commercial activity shall be conducted or permitted thereon."

[¶64] The plain meaning of "[c]ommercial" is "occupied with or engaged in commerce or work intended for commerce" and "of or relating to commerce." *See* https://www.merriam-webster.com/dictionary/commercial. Black's Law Dictionary defines it as "[o]f, relating to, or involving the buying and selling of goods; mercantile"; "[r]esulting or accruing from commerce or exchange"; "[e]mployed in trade; engaged in commerce"; "[m]anufactured for the markets; put up for trade"; "[o]f, relating to, or involving the ability of a product or business to make a profit"; and [p]roduced and sold in large quantities." Commercial, Black's Law Dictionary (11th ed. 2019). The plain meaning of "commerce" is "the exchange or buying and selling of commodities on a large scale involving transportation from place to place." *See* https://www.merriam-webster.com/dictionary/commerce. Similarly, Black's Law Dictionary defines "commerce" as "[t]he exchange of goods and services, esp. on a large scale involving transportation between cities, states, and countries." Commerce, Black's Law Dictionary (11th ed. 2019). These definitions are clear. The covenant prohibiting commercial activity

prohibits a landowner from conducting or allowing the exchange of goods or services involving transportation from place to place on his property.

[¶65]   This interpretation is consistent with the stated purposes of the covenant, as well as the covenants as a whole.   The covenants clearly seek to maintain the subdivision as residential.   Not only is that one of the stated purposes of the covenants, the prohibition on "commercial activity" appears in the same covenant which limits the use of subdivision land to "residential purposes" only.   Placing the term "commercial activity" in context with the requirement that the land be used only for "residential purposes" reveals "commercial activity" is limited to the exchange of goods or services involving transportation from place to place which is inconsistent with the residential use of one's property and with the residential nature of the subdivision as a whole.

[¶66]   Given the clear scope of the covenant, the district court erred in deciding the covenant was ambiguous and Mr. Jerup's maintenance and repair of the motor grader in May 2018 constituted a *de minimis* technical violation of the covenant prohibiting commercial activity upon his property.   His maintenance and repair of the motor grader for HRISD did not constitute a violation of the covenants—*de minimis*, technical, or otherwise. This activity did not involve the exchange of goods or services involving transportation from place to place.   Nor did it detract from Mr. Jerup's use of his property as a residence or from the residential nature of the subdivision.   That being said, the district court did not err in entering judgment in favor of Mr. Jerup because the evidence showed he did not violate the covenant prohibiting commercial activity on his property.   Rather, the evidence unequivocally established Mr. Jerup's property was residential both before and after he performed maintenance and snowplowing on the subdivision's roads.

[¶67]   Mr. Jerup and his family live on his property year-round.   It is their home.   Mr. Jerup works full-time for WYDOT in Jackson, plowing and maintaining the public highways. He performs road maintenance on the subdivision's roads for HRISD one day per week in the summer and snowplows those roads for the Winter Committee during the winter. HRISD and the Winter Committee pay Mr. Jerup for these services, and he reports that income on his tax returns as deriving from a business.   He deducted the expense of purchasing the motor grader and depreciated the grader on his tax returns.   He also maintains and plows Vista Ridge Lane, his and his neighbors only access to their properties.   Mr. Jerup does not charge for or get paid to maintain and plow Vista Ridge Lane, although on occasion his neighbors have reimbursed him for his fuel or paid him in kind with gravel.   To maintain and plow Vista Ridge Lane and the subdivision roads, he owns, stores, and fuels various pieces of heavy equipment on his property.   Mr. Jerup recently began construction of a shop on his property to house his equipment.

[¶68]   The above activity does not involve the exchange of goods or services involving transportation outside the subdivision.   Moreover, this activity is necessary to ensure his use of his property as a residence and to maintain the residential nature of the subdivision.

Mr. Jerup testified Vista Ridge Lane must be maintained and plowed to ensure he and his neighbors to the north can safely access their homes. Dena Baker, one of his neighbors to the north of his property, agreed. Mr. Jerup also testified he would snowplow Rim Road, whether or not he was paid by the Winter Committee, so he and his family can leave the subdivision in the winter. Other landowners, including the Winneys, use Rim Road to access the public highway. Even Hoback Ranches, Inc., recognized the subdivision's roads would need to be graded at least two times per year and the culverts kept clean for drainage purposes.

[¶69] Due to the remote location of the subdivision, the storage and fueling of equipment on one's property are necessary and commonplace in the subdivision. Mr. Jerup testified that within a few weeks of trial, he had observed the following within 1-2 miles of his home: twelve properties with snow removal equipment; nine with tractors; six with flatbed or large trucks; twelve with backhoes; four with large non-recreational use trailers; five with dump trucks; five with large over-the-snow vehicles; two with tractors with tracks; and five with 55-gallon plus fuel storage tanks. Mr. Ryan testified he has observed over the past ten years at least twelve properties with 55-plus gallon fuel storage tanks; six with dump trucks; three with bulldozers; twelve with tractors; and seven or eight with backhoes. According to Mr. Jerup, "people that want to take care of themselves in such a rural area need equipment so they don't have to rely on other people." Mr. Ryan agreed: "[I]f you expect to drive a vehicle in and out of [the subdivision in the winter], I wouldn't live there without a piece of equipment."

[¶70] Mr. Jerup's construction of a shop on his property to garage his equipment is allowed by the covenants, which prohibit the construction of structures other than "single family dwellings, *garage buildings*, stables, and other structures incident to single family residential use of the tract." (Emphasis added). Moreover, Mr. Jerup's purpose in building the shop on his property is to house the equipment he utilizes to maintain his property as his residence.

[¶71] Mr. Winney testified he observed 138-148 heavy equipment moves on Vista Ridge Lane in 2017, 129 in 2018, and 109 in 2019. The Winneys also introduced various video and/or audio clips of Mr. Jerup allegedly driving his equipment past their home on Vista Ridge Lane. However, as the district court found, in some of the video clips it was unclear whether it was Mr. Jerup driving his equipment or some other person driving equipment not belonging to Mr. Jerup. Indeed, Ms. Winney testified that on June 4, 2019, there were approximately nineteen dump truck moves on Vista Ridge Lane. She "assum[ed]" it was Mr. Jerup.

[¶72] Even if it was Mr. Jerup driving the equipment, the Winneys failed to present any evidence these heavy equipment moves involved the exchange of goods or services outside the subdivision rather than activities to ensure the residential nature of Mr. Jerup's property and the subdivision. Indeed, Mr. Jerup testified that in 2019, after several of his neighbors

21

to the north lost their homes in the Roosevelt Fire, he hauled loads of gravel to fix Vista Ridge Lane so builders could access his neighbors' properties. Ms. Baker confirmed this and testified the nineteen heavy equipment moves witnessed by Ms. Winney on June 4, 2019, were likely Mr. Jerup assisting her in the rebuilding of her home which was lost in the fire.

[¶73] The Winneys rely on *Bowers Welding & Hotshot, Inc. (Bowers) v. Bromley*, 699 P.2d 299, 301 (Wyo. 1985), for the proposition that storing and fueling heavy equipment used for one's business on one's property and dispatching it from the property constitutes commercial activity. *Bowers* is not on point for two reasons. First, although the district court in *Bowers* found the defendants were conducting commercial activities on their property in the subdivision in violation of restrictive covenants requiring their property to be used for "residential purposes only," the issue on appeal was whether the district court erred in finding defendants' activities constituted a "nuisance." *Bowers*, 699 P.2d at 300. Second, the evidence the district court relied on in *Bowers* to find the defendants were conducting commercial activities upon their property is distinguishable from that present in this case. In *Bowers*, the defendants conducted a welding, repair and hot shot business on their property; built a 60' x 100' commercial building on their property; rented equipment to their business; dispatched and directed truck traffic from their property; loaded, unloaded and stored drill pipe on their property; stacked and stored drilling rigs on their property; stored and used numerous pieces of pipe, sheet metal, and scrap iron on their property for use in their welding business; constructed and fabricated large water tanks on their property; used employees on their property and dispatched them therefrom; provided employee parking on their property; and parked and used numerous commercial vehicles, including trucks, trailers, forklifts, and welding equipment, on their property. *Id.* at 306-07. These activities, unlike Mr. Jerup's, involved the exchange of goods or services outside the subdivision and there is no indication they were necessary to support the residential use of the defendants' property or to maintain the residential nature of the subdivision.

## CONCLUSION

[¶74] The district court correctly concluded HRISD's taxing authority was not limited by the 8 mill levy limitation contained in the Petition for Formation and did not err in entering judgment in favor of Mr. Jerup because he did not violate the protective covenant prohibiting commercial activity on his property. However, the district court erred in deciding the buck and pole fence covenant does not apply to the subdivision's perimeter fence. The Winneys waived their argument that HRISD lacked the authority to enforce the covenants against them.

[¶75] We affirm in part, reverse in part, and remand to the district court to consider in the first instance HRISD's argument that it would be inequitable to enforce the buck and pole fence covenant.

22